1  RICHARD W. COHEN
   DAVID C. HARRISON
2  LOWEY DANNENBERG COHEN, P.C.
   One North Broadway
3  White Plains, New York 10601-2310
   Telephone: 914-997-0500
4  *Counsel for the New York City Pension Funds*

5  WILLEM F. JONCKHEER S.B.N. 178748
   SCHUBERT & REED LLP
6  Three Embarcadero Center, Suite 1650
   San Francisco, California 94111
7  Telephone: 415-788-4220
   *Local Counsel*

8

9                    UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

CV 08 0246

12  THE NEW YORK CITY EMPLOYEES' RETIRE-           No. _____
    MENT SYSTEM, THE TEACHERS' RETIREMENT
13  SYSTEM OF THE CITY OF NEW YORK, THE            **CLASS ACTION
    NEW YORK CITY FIRE DEPARTMENT PENSION          COMPLAINT FOR
14  FUND, THE NEW YORK CITY POLICE PENSION         VIOLATION OF FEDERAL
    FUND, THE NEW YORK CITY POLICE SUPERIOR        SECURITIES LAWS**
15  OFFICERS' VARIABLE SUPPLEMENTS FUND,
    THE NEW YORK CITY POLICE OFFICERS'             **JURY TRIAL DEMANDED**
16  VARIABLE SUPPLEMENTS FUND, THE NEW
    YORK CITY FIREFIGHTERS' VARIABLE
17  SUPPLEMENTS FUND, THE NEW YORK CITY
    FIRE OFFICERS' VARIABLE SUPPLEMENTS
18  FUND, AND THE NEW YORK CITY TEACHERS'
    RETIREMENT SYSTEM OF THE CITY OF NEW
19  YORK VARIABLE ANNUITY PROGRAM,

20                      Plaintiffs,

21                  v.

22  LISA C. BERRY,

23                      Defendant.

24

25

26      The NYC Funds, as defined herein at ¶ 15, for their Class Action Complaint (the

27  "Complaint"), allege the following upon personal knowledge as to themselves and their own acts,

28  and upon information and belief based upon the investigation made by and through their attorneys as

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  to all other matters. This investigation included, *inter alia*, a review and analysis of: (a) public
2  documents pertaining to Juniper Networks, Inc. ("Juniper" or the "Company") and the other
3  defendants named herein; (b) filings with the Securities and Exchange Commission (the "SEC");
4  (c) the pleadings and other proceedings in lawsuits the SEC has filed against Juniper and its former
5  General Counsel, Lisa C. Berry ("Berry"); (d) the Company's press releases and public statements;
6  (e) analyst reports concerning the Company; (f) newspaper and magazine articles and other media
7  coverage regarding Juniper, its business and securities; and (g) studies and analyses concerning
8  abusive practices with respect to the granting of corporate stock options.

## NATURE OF THE ACTION

10   1.   The NYC Funds have been designated Lead Plaintiff under the Private Securities
11  Law Reform Act ("PSLRA") in the consolidated class actions styled *In re Juniper Networks*
12  *Securities Litigation*, No. C 06-04327-JW (N.D. Cal.) (the "Consolidated Action"). The NYC
13  Funds bring this lawsuit as a related case to the Consolidated Action solely for purposes of adding as
14  a defendant Lisa C. Berry, Juniper's former general counsel, in order to prevent the statute of
15  limitations governing securities fraud claims from expiring. The NYC Funds intend to move to
16  consolidate this case with the Consolidated Action.

17   2.   From June 1999 through 2003, defendant Berry and other Juniper senior executives
18  falsified financial statements and backdated option grants to purchase millions of shares of stock, in
19  order to enrich themselves and other Juniper insiders at the expense of the corporation and its public
20  stockholders. Berry and other Juniper executives falsely reported how Juniper granted these options
21  in order to conceal their backdating scheme. This false reporting and concealment resulted in
22  Juniper's material systematic overstatement of income from June 1999 through mid-2006,
23  eventually requiring Juniper to restate its financial results to record $900 million in compensation
24  expenses over a several-year period.

25   3.   Juniper had two stock option plans outstanding prior to and during the Class Period:
26  the Amended and Restated 1996 Stock Options Plan (the "1996 Plan") and the 2000 Nonstatutory
27  Stock Option Plan (the "2000 Plan") (together, the "Stock Option Plans"). The 1996 Plan provided
28  for the grant of certain stock options to employees, consultants, and non-management directors,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 whereas the 2000 Plan was designed for employees and consultants only. Options granted under
2 both Stock Option Plans generally vested over a four-year period beginning on the date of grant and
3 had a maximum term of ten years.

4    4.    Both Stock Option Plans provided that the exercise price of a stock option would be
5 set by the Board of Directors or a committee designated to administer the Stock Option Plans, which
6 included the Compensation Committee of the Board in the case of Juniper Officers and Directors,
7 and the Stock Option Committee (the "SOC") in the case of Juniper's non-officer employees. In
8 practice, however, the SOC was responsible for the selection of the exercise price for most option
9 grants.

10    5.    The scheme was orchestrated by three present or former Juniper officers who
11 comprised the SOC – Lisa C. Berry, former General Counsel, Vice President and Corporate
12 Secretary; Scott Kriens ("Kriens"), Chief Executive Officer; and Marcel Gani ("Gani"), former
13 Chief Financial Officer. Kriens and Gani are defendants in the Consolidated Action and, together
14 with Berry, are referred to as the "Officer Defendants."

15    6.    The Officer Defendants caused the Company to (a) issue more than 110 million
16 backdated or otherwise intentionally mispriced stock options (76% of the total options granted) to
17 enrich themselves and their colleagues and (b) conceal their fraud by filing false public filings with
18 the SEC which understated the Company's expenses by approximately $900 million.

19    7.    Concealing the backdating practices enabled the Officer Defendants and other
20 grantees to receive hundreds of millions of dollars in immediate financial benefits (including
21 underreporting their compensation to the IRS) without reducing the Company's reported earnings.
22 Both Berry and Gani cashed in the underpriced options for millions of dollars in illicit profits prior
23 to their departures at the end of 2003 and 2004, respectively.

24    8.    The NYC Funds bring this action against Berry under the federal securities laws to
25 recover the losses sustained by the NYC Funds and other public investors who purchased or
26 otherwise acquired the publicly traded securities of Juniper from January 15, 2003 through August
27 10, 2006 (the "Class Period").

28    9.    In May 2006, *The Wall Street Journal* and other major news carriers gave widespread

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  coverage to two separate studies released by independent financial analysts identifying Juniper as a
2  high-risk candidate for having backdated executive stock options. The price of Juniper shares
3  dropped on heavy trading volume in response to these adverse disclosures, and fell again on
4  extraordinary volume following Juniper's confession on August 10, 2006, the close of the Class
5  Period, that the Company's improper accounting for such option grants would require restatement of
6  more than three years of financial results. Juniper shares declined from approximately $16.87 per
7  share to $12.20 per share, more than 20%, in response to these curative disclosures, causing
8  damages aggregating many hundreds of millions of dollars to the NYC Funds and other purchasers
9  or acquirors of Juniper securities.

10       10.    Since the end of the Class Period, (a) Juniper has restated its financial statements for
11  a seven-year period, from Juniper's initial trading as a public company in June 1999 through the first
12  quarter of 2006, to record the approximately $900 million in expenses that had been underreported
13  as a result of the scheme; (b) the Company  has consented to the entry of a permanent injunction
14  barring further violations of, *inter alia*, the antifraud and proxy provisions of the federal securities
15  laws; (c) the SEC has filed separate actions against Juniper and Berry for violations of the federal
16  securities law; and (d) the Company's Chief Financial Officer (Robert Dykes) and two of the three
17  members of the Compensation Committee of the Juniper Board of Directors (defendant Kenneth
18  Levy ("Levy") and Frank Marshall ("Marshall")) have resigned. Each of these matters is described
19  in further detail herein.

20                              **JURISDICTION AND VENUE**

21       11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act
22  of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated
23  thereunder by the SEC, 17 C.F.R. § 10b-5.

24       12.    This Court has subject matter jurisdiction over this action pursuant to Section 27 of
25  the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1337.

26       13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28
27  U.S.C. § 1391(b). Many of the acts and transactions constituting the violations of law alleged
28  herein, including the preparation, issuance, and dissemination of materially false and misleading

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  statements, occurred in this District, where Juniper maintains its headquarters.

2      14.    In connection with the acts, transactions, and conduct alleged herein, defendants,
3  directly and indirectly, used the means and instrumentalities of interstate commerce, including the
4  United States mails, interstate telephone communications, and the facilities of a national securities
5  exchange and market.

## THE PARTIES

### Lead Plaintiff

8      15.    The New York City Pension Funds are comprised of the New York City Employees'
9  Retirement System ("NYCERS"), the Teachers' Retirement System of the City of New York
10 ("NYCTRS"), the New York City Fire Department Pension Fund ("FIRE"), the New York City
11 Police Pension Fund ("POLICE"), and five variable supplemental funds: the New York City Police
12 Superior Officers' Variable Supplements Fund ("PSOVSF"), the New York City Police Officers'
13 Variable Supplements Fund ("POVSF"), the New York City Firefighters' Variable Supplements
14 Fund ("FFVSF"), the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), and
15 the New York City Teachers' Retirement System of the City of New York Variable Annuity
16 Program ("NYCTRS Variable A") (collectively, the "NYC Funds" or "Plaintiff"). As of August 31,
17 2007, the NYC Funds had approximately $114 billion in assets, and approximately 262,000 retired
18 members and 370,000 active members. On November 20, 2006, the Hon. James Ware appointed the
19 NYC Funds as Lead Plaintiff in the Consolidated Action.

20     16.    NYCERS, established under Section 12-102 of the Administrative Code of the City
21 of New York, provides pension benefits to all New York City employees who are not eligible to
22 participate in separate Fire Department, Police Department, or NYCTRS pension funds.

23     17.    NYCTRS maintains two separate retirement programs, the Qualified Pension Plan
24 ("QPP") and the Tax-Deferred Annuity Program ("TDA"). The QPP, established pursuant to
25 Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to
26 those with regular appointments to the pedagogical staff of the Board of Education. The TDA,
27 established pursuant to Internal Revenue Code Section 403(b), provides a means of deferring
28 income tax payments on voluntary tax-deferred contributions.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    18.    FIRE, established pursuant to Section 13-301 of the Administrative Code of the City
2  of New York, provides pension benefits for full-time uniformed employees of the New York City
3  Fire Department.

4    19.    POLICE, created pursuant to New York Local Law 2 of 1940, provides pension
5  benefits for full-time uniformed employees of the New York City Police Department.

6    20.    PSOVSF, POVSF, FFVSF, FOVSF, and NYCTRS Variable A were established,
7  pursuant to enabling State legislation, to provide certain retirees of the New York City Police
8  Department, the New York City Fire Department, and retirees and members of the New York City
9  Teachers Retirement System, with supplemental benefits from variable supplement funds and/or
10  additional investment options.

11    21.    The NYC Funds purchased or acquired Juniper common stock during the Class
12  Period and suffered damages as a result of the federal securities law violations alleged herein. The
13  NYC Funds have previously filed amended certifications in the Consolidated Action (Dkt. #73)
14  which set forth their transactions in Juniper securities during the Class Period.

15  **Defendant Berry**

16    22.    Defendant Berry served as Juniper's General Counsel beginning June 18, 1999, and,
17  beginning in July 1999, also served as Vice President and Secretary, and as a member of the SOC
18  until her departure at year-end 2003.

19    23.    Berry majored in accounting in college, and then obtained both a law degree (J.D.)
20  and a Master of Law degree (L.L.M.) in taxation. From September 1996 until June 1999, Berry was
21  Vice President and General Counsel of KLA-Tencor Corporation ("KLA"), a publicly traded
22  corporation that makes and sells systems for the semiconductor industry. During her employment at
23  KLA, Berry reported to defendant Levy, then Chairman of the Board and Chief Executive Officer of
24  KLA, and a Director of Juniper during part of the Class Period. Berry engaged in stock option
25  backdating practices at KLA, and then implemented similar practices after joining Juniper in July
26  1999.

27    24.    Berry was responsible for overseeing Juniper's stock option grant process. From
28  mid-1999 through 2003, she designed and implemented procedures to backdate Juniper's stock

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                                          Page 6

option grants to herself and her fellow officers and co-workers to a date in the past when Juniper's stock price was lower. Berry then routinely created minutes for purported SOC meetings that never occurred. Berry signed the fictitious minutes approving each of the backdated option grants, then presented the fictitious minutes to fellow SOC members Kriens and Gani for their signature, or stamped the minutes with a signature stamp she maintained bearing the other SOC members' signatures.

25. Berry received backdated in-the-money stock option grants from Juniper on at least five separate occasions. The dates of these purported grants were: May 11, 2000; December 21, 2000; April 11, 2001; July 1, 2002; and March 12, 2003. As a result, Berry personally benefited from the backdating and received unreported compensation from the backdated grants. Berry exercised certain of the backdated stock options and sold Juniper shares, including shares she received based on her exercise of backdated stock options, while in the possession of undisclosed material adverse information about the Company's backdating practices and improper accounting for stock options.

26. Berry drafted Juniper's false and misleading Proxy Statements for 2000 through 2003, which she signed as Juniper's General Counsel, Vice President and Secretary, and the Form 4s filed with the SEC by other Officer Defendants, which she signed on their behalf under power of attorney. Berry substantially participated in the creation, review, and/or signing of other Juniper SEC filings during the Class Period, which included or incorporated by reference the false and misleading financial statements. Such statements and/or their results were also included or incorporated by reference in the Company's press releases during the Class Period.

27. By reason of her multiple positions as an officer and general counsel of Juniper and as a member of the Stock Option Committee, and because of her ability to influence the business, corporate, legal, and financial affairs of Juniper, Berry was fully involved in, and fully informed about, the management and administration of the affairs of the Company, including the administration of the Company's stock options and incentive plans, Juniper's internal policies, and Juniper's compliance with all applicable federal and state laws, rules, and regulations, including the federal securities laws.

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                    Page 7

1

## Defendants in the Consolidated Action

2

### Juniper

3     28.     Defendant Juniper is an internet networking equipment company that makes the
4 routers and other equipment that direct data traffic over computer networks. The Company
5 maintains its principal executive offices at 1194 North Matilda Avenue, Sunnyvale, California
6 94089.

7

### The Officer Defendants

8

### Kriens

9     29.     Kriens has served since October 1996 as Chief Executive Officer and Chairman of
10 the Juniper Board of Directors, and was a member of the three-person Stock Option Committee.

11     30.     As a member of the SOC, Kriens approved the issuance of more than 100 million
12 backdated or otherwise mispriced option grants to himself and his fellow officers and co-workers;
13 signed or permitted the use of facsimile stamps to sign the minutes of fictitious meetings purporting
14 to authorize the grants; and misrepresented the true facts in Juniper's public filings.

15     31.     Kriens participated in the issuance of and signed the Company's false and misleading
16 SEC filings during the Class Period, including Juniper's annual reports for fiscal years 2001 through
17 2005 on Form 10-K, and the registration statements on Form S-3, dated November 20, 2003,
18 pursuant to which Juniper issued $400 million Zero Coupon Convertible Senior Notes due June 15,
19 2008 (the "Notes"), and on Form S-4, dated March 10, 2004, pursuant to which Juniper issued
20 common stock in connection with Juniper's merger with NetScreen Technologies, Inc.
21 ("NetScreen") (collectively, the "Registration Statements"). Kriens also signed the 2006 Form 10-
22 K.

23     32.     From June 1999 through December 31, 2003, Kriens received at least 3,550,000
24 backdated stock options. As a result, Kriens personally benefited from the backdating and received
25 unreported compensation from in-the-money Juniper options.

26     33.     In addition, Kriens sold approximately 7,000,000 shares of Juniper stock, reaping
27 proceeds of approximately $131 million, while in the possession of undisclosed material adverse
28 information about the Company's backdating practices and improper accounting for stock options.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Gani**

34.    Gani served as Juniper's Chief Financial Officer from February 1997 and as Executive Vice President and Chief Financial Officer of the Company from July 2002 through December 31, 2004, and was a member of the three-person SOC. Mr. Gani then assumed the position of Juniper Chief of Staff until he retired in 2005.

35.    As a member of the SOC, Gani approved the issuance of more than 100 million backdated option grants to himself and his fellow officers and co-workers; signed or permitted the use of facsimile stamps to sign the minutes of fictitious meetings purporting to authorize the grants; and misrepresented the true facts in Juniper's public filings.

36.    Gani participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports on Form 10-K for fiscal years 2001 through 2003, the Company's reports on Form 10-Q for each quarter during 2001 through 2004, and the Registration Statements for the NetScreen acquisition and the Notes offering.

37.    From June 1999 through December 31, 2003, Gani received at least 1,580,000 backdated stock options. As a result, Kriens personally benefited from the backdating and received unreported compensation from in-the-money Juniper options.

38.    In addition, Gani exercised 300,000 backdated options and sold the shares for an approximately $3.9 million profit, and he made an additional $8.4 million profit from the sale of another 350,000 shares, while in the possession of undisclosed material adverse information about the Company's backdating practices and improper accounting for stock options.

**Juniper Directors**

39.    Chief Technical Officer Pradeep Sindhu ("Sindhu") co-founded Juniper in February 1996 and served as Chief Executive Officer and Chairman of the Board of Directors until September 1996. Since that time, Sindhu has served as Juniper's Chief Technical Officer and as Vice Chairman of the Board of Directors. Sindhu participated in the issuance of and signed the Company's false and misleading SEC filings during the Class Period, including Juniper's annual reports for fiscal years 2001 through 2005 on Form 10-K, and the Registration Statements for the NetScreen merger and the Notes offering. Sindhu also signed the 2006 Form 10-K.

40.    From June 1999 through December 31, 2003, Sindhu received at least 1,780,000 backdated stock options. During the Class Period, Sindhu sold approximately 3,400,000 shares of Juniper stock, reaping proceeds of more than $73 million, while in the possession of undisclosed material adverse information about the Company's backdating practices and improper accounting for stock options.

41.    Vinod Khosla ("Khosla") was, from February 1996 through April 15, 2004, a Director of Juniper and a member of the Compensation Committee. As a member of the Board and the Compensation Committee, Khosla established policies concerning stock option compensation and approved certain option grants which Juniper admits were improperly backdated or mispriced from at least June 1999 through 2003, and reported on those activities in the Company's Proxy Statements. Khosla participated in the issuance of and signed the Company's false and misleading Form 10-Ks for 2001 through 2003 and the Registration Statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in the Company's Proxy Statements.

42.    Levy served from 2003 as a Director of Juniper and a member of the Compensation Committee until his resignation on or about February 27, 2007. As a member of the Board of Directors and/or the Compensation Committee, Levy established policies concerning stock option compensation, approved certain option grants that were improperly backdated or mispriced, and reported on those activities in the Company's Proxy Statements. Levy participated in the issuance of and signed the Company's false and misleading Form 10-Ks for 2003 through 2005 and the Registration Statements for the NetScreen merger and the Notes offering, and authorized the inclusion of a false and misleading Compensation Committee Report on Executive Compensation in Juniper's Proxy Statements. Levy also signed the 2006 Form 10-K.

43.    William R. Stensrud ("Stensrud") has served since October 1996 as a Director of Juniper, and since 2002 as a member of the Compensation Committee. As a member of the Board of Directors and/or the Compensation Committee, Stensrud established policies concerning stock option compensation and approved certain option grants that were improperly backdated or mispriced, and reported on those activities in the Company's Proxy Statements. Stensrud

1 participated in the issuance of and signed the Company's false and misleading Form 10-Ks for 2001

2 through 2005 and the Registration Statements for the NetScreen merger and the Notes offering, and

3 authorized the inclusion of a false and misleading Compensation Committee Report on Executive

4 Compensation in the Company's Proxy Statements. Stensrud also signed the 2006 Form 10-K.

5      44.     Robert M. Calderoni ("Calderoni") has served since October 2003 as a Director of

6 Juniper and a member of the Audit Committee of the Board. As a member of the Audit Committee,

7 Calderoni established and implemented policies concerning the Company's financial reporting and

8 public disclosure activities, and reported on those activities in the Company's Proxy Statements.

9 Calderoni participated in the issuance of and signed the Company's false and misleading SEC

10 filings during the Class Period, including Juniper's Form 10-Ks for 2003 through 2005, and the

11 Registration Statements for the NetScreen merger and the Notes offering. Calderoni also signed the

12 2006 Form 10-K.

13      45.     Kenneth Goldman ("Goldman") has served since October 2003 as a Director of

14 Juniper and the Chair of the Audit Committee of the Board. Goldman is identified in Juniper's SEC

15 filings as an "audit committee expert" under SEC rules. As Chairman of the Audit Committee,

16 Goldman established and implemented policies concerning the Company's financial reporting and

17 public disclosure activities, and reported on those activities in the Company's proxy statements.

18 Goldman participated in the issuance of and signed the Company's false and misleading SEC filings

19 during the Class Period, including Juniper's Form 10-Ks for 2003 through 2005, and the

20 Registration Statements for the NetScreen merger and the Notes offering. Goldman also signed the

21 2006 Form 10-K.

22      46.     William R. Hearst III ("Hearst") has served since 1996 as a Director of Juniper and

23 has been a member of the Audit Committee since 1999. As a member of the Audit Committee,

24 Hearst established and implemented policies concerning the Company's financial reporting and

25 public disclosure activities, and reported on those activities in the Company's Proxy Statements.

26 Hearst participated in the issuance of and signed the Company's false and misleading SEC filings

27 during the Class Period, including Juniper's Form 10-Ks for 2001 through 2005, and the

28 Registration Statements for the NetScreen merger and the Notes offering. Hearst also signed the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS      Page 11

1   2006 Form 10-K.

2   47.     Stratton Sclavos ("Sclavos") has served since May 2000 as a Director of Juniper and
3   a member of the Audit Committee of the Board for the years 2000 through 2002. As a member of
4   the Audit Committee, Sclavos established and implemented policies concerning the Company's
5   financial reporting and public disclosure activities, and reported on those activities in the Company's
6   Proxy Statements. Sclavos signed the Company's Form 10-Ks for 2001 through 2006, and the
7   Registration Statements for the NetScreen merger and the Notes offering.

8   48.     Sindhu, Calderoni, Goldman, Hearst, Sclavos, Khosla, Levy, and Stensrud are
9   collectively referred to as the "Juniper Directors."

10  49.     Juniper, the Officer Defendants (including Berry), and the Juniper Directors are
11  collectively referred to as the "Juniper Defendants."

## CLASS ACTION ALLEGATIONS

13  50.     The NYC Funds bring this action as a class action pursuant to Federal Rules of Civil
14  Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") of all persons who purchased or
15  otherwise acquired publicly traded Juniper securities during the period from January 15, 2003
16  through and including August 10, 2006, and who were damaged thereby.

17  51.     Excluded from the Class are Berry; members of the immediate family of Berry (or
18  any other Officer Defendant); any parent, subsidiary, affiliate, officer, or director of Juniper; any
19  entity in which any excluded person has a controlling interest; and the legal representatives, heirs,
20  successors, and assigns of any excluded person or entity.

21  52.     The members of the Class are so numerous that joinder of all members is
22  impracticable. While the exact number of members of the Class is unknown to the NYC Funds at
23  present and can only be ascertained from books and records maintained by Juniper and/or its
24  agent(s), Plaintiff believes that there are tens of thousands of members of the Class located
25  throughout the United States. As of July 31, 2007, Juniper had issued and outstanding over 514
26  million shares of common stock and approximately $400 million principal amount of Notes.
27  Throughout the Class Period, Juniper's securities and Notes were actively traded, with more than 9.0
28  billion shares traded on the NASDAQ National Market System during the Class Period.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    53.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and

2    all members of the Class purchased Juniper securities at artificially inflated prices and have

3    sustained damages arising out of the same wrongful course of conduct.

4    54.    Plaintiff will fairly and adequately represent and protect the interests of the members

5    of the Class. Plaintiff has retained extremely competent counsel experienced in class and securities

6    litigation, and intends to prosecute this action vigorously. Plaintiff is a member of the Class and

7    does not have interests antagonistic to, or in conflict with, the other members of the Class.

8    55.    Common questions of law and fact exist as to all members of the Class and

9    predominate over any questions solely affecting individual members. Among the questions of law

10    and fact common to the Class are:

11    a.    whether the federal securities laws were violated by defendants' acts and

12    omissions as alleged herein;

13    b.    whether Berry participated in and pursued the common course of conduct and

14    fraudulent scheme complained of herein;

15    c.    whether the statements disseminated to the investing public, including

16    investors in Juniper securities, during the Class Period omitted and/or misrepresented material facts

17    about Juniper's financial condition and compensation arrangements;

18    d.    whether Juniper's financial results during the Class Period were materially

19    misstated;

20    e.    whether Berry had knowledge of or was reckless with respect to the improper

21    activities described herein;

22    f.    whether the market prices of Juniper's securities during the Class Period were

23    artificially inflated due to the material omissions and/or misrepresentations complained of herein;

24    and

25    g.    whether Plaintiff and the other members of the Class have sustained damages

26    and, if so, the appropriate measure thereof.

27    56.    A class action is superior to the other available methods for the fair and efficient

28    adjudication of this controversy because, among other things, joinder of all members of the Class is

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1   impracticable. Moreover, because the damages suffered by many individual Class members may be
2   relatively small, the expense and burden of individual litigation make it virtually impossible for
3   Class members individually to seek redress for the wrongful conduct alleged. Plaintiff does not
4   foresee any difficulty in the management of this litigation, which it intends to consolidate with the
5   Consolidated Action, that would preclude its maintenance as a class action.

6   57.   The names and addresses of the record owners of Juniper common stock and Notes
7   purchased during the Class Period are available from Juniper and/or its transfer agent(s). Notice can
8   be provided to persons who purchased or otherwise acquired Juniper common stock by a
9   combination of published notice and first-class mail, using techniques and forms of notice similar to
10  those customarily used in other class actions arising under the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

58.   The use of stock options surged in the late 1990s, as fledgling firms such as Juniper,
that had bright prospects but little revenues, used stock options to attract and pay employees. As
dot-com and telecom share prices soared, stock options became a source of vast wealth for company
executives as well as employees who received lucrative stock option packages in connection with
their hiring.

59.   On June 24, 1999, Juniper became a public company through an initial public
offering of its stock ("IPO"). Juniper grew rapidly following its IPO, hiring hundreds of employees
through early June 2003. To support this rapid growth and to achieve its recruiting and
compensation objectives, Juniper relied heavily on the use of stock options in lieu of cash
compensation. By compensating employees with stock options, Juniper avoided paying greater cash
salaries or other forms of cash compensation that would have been necessary to attract and retain
employees. Juniper granted stock options to nearly all new full-time employees. Juniper also
granted options to existing Juniper employees, based on performance or other factors. Prior to 2003,
the Company also paid its non-management directors for their services solely with stock options.
To accomplish this massive undertaking involving the administration of tens of millions of stock
option grants, on July 21, 1999, the Board established the SOC.

60.   The SOC was comprised of three Juniper officers: the General Counsel (Berry);

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                    Page 14

1    Chief Executive Officer (Kriens), and Chief Financial Officer (Gani and later Dykes). The SOC

2    was responsible for granting and administering Juniper's stock options to the Company's non-

3    officer employees in accordance with the terms of Juniper's stock option plans and applicable

4    accounting principles set forth in Accounting Principles Board Opinion No. 25, "Accounting for

5    Stock Issued to Employees" and related Interpretations ("APB No. 25").

6    61.    The Stock Option Committee was also given responsibility for the issuance and/or

7    timing of the option grants to Juniper executives. For example, in a letter dated November 30, 2004,

8    offering Dykes employment as the new CFO, Kriens represented: "I will recommend to the Stock

9    Option Committee that an option of 500,000 shares of [Juniper] common stock be granted to you . . .

10   contingent upon approval of the CC [Compensation Committee]." The letter was filed as an Exhibit

11   to Juniper's Form 8-K dated December 13, 2004.

12   62.    As a member of the Stock Option Committee and the top corporate legal officer,

13   Berry was fully aware of (a) the Company's compensation arrangements, including granting and

14   accounting for Company stock options; (b) public disclosures relating thereto; and (c) its compliance

15   with requirements of the Sarbanes-Oxley Act of 2002 ("SOX") regarding, *inter alia*, internal

16   disclosure controls.

17   **Juniper's Compensation Philosophy Embraced the Wide Use of Stock Options**

18   63.    Juniper's compensation philosophy was described in a proxy statement filed with the

19   SEC on Schedule 14A dated April 13, 2000 (the "2000 Proxy Statement"), as follows:

20   The [Compensation] Committee's approach is predicated upon the
     philosophy that a substantial portion of aggregate annual
21   compensation for executive officers should be contingent upon the
     Company's performance and an individual's contribution to the
22   Company's success in meeting certain critical objectives. In addition,
     the Committee strives to align the interests of the Company's
23   executive officers with the long-term interests of stockholders through
     stock option grants such that grants of stock options should relate the
24   performance of the executive to the market perception of the
     performance of the Company.
25

26   *      *      *

27   Stock options are granted at market price on the date of the grant and
     will provide value to the executive officers only when the price of the
28   Company's Common Stock increases over the exercise price.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 (Emphasis added.) Berry drafted the 2000 Proxy Statement and signed it on behalf of "The Board of

2 Directors."

3     64.    As reflected in Juniper's proxy statements, Kriens' total cash compensation from

4 salary and bonus from 1999 through 2003 ranged from $175,000 to $436,350; Gani's annual cash

5 compensation ranged from $157,425 to $317,345; and Sindhu's cash compensation ranged from

6 $162,500 to $255,554. However, as shown in the tables below, these compensation figures pale

7 when compared to the tens of millions of dollars they potentially stood to realize from their stock

8 option grants:

| | | 1999 | | 2000 |
|---|---|---|---|---|
| | Options Granted* | Potential Value (5% Price Apprec.) | Options Granted* | Potential Value (5% Price Apprec.) |
| Kriens | 1,800,000 | 34,361,211 | 400,000 | 23,630,716 |
| Gani | 480,000 | 9,162,990 | 100,000 | 5,907,679 |
| Sindhu | 1,080,000 | 20,616,727 | 100,000 | 5,907,679 |
| | * Adjusted for stock split. | | * Adjusted for stock split. | |

| | | 2002 | | 2003 |
|---|---|---|---|---|
| | Options Granted* | Potential Value (5% Price Apprec.) | Options Granted* | Potential Value (5% Price Apprec.) |
| Kriens | 2,750,000 | 16,232,714 | 800,000 | 7,546,736 |
| Gani | 1,080,000 | 5,549,869 | 50,000 | 4,716,710 |
| Sindhu | 400,000 | 1,721,913 | 300,000 | 1,962,162 |
| | * Adjusted for stock split. | | * Adjusted for stock split. | |

20     65.    As detailed herein, contrary to the Company's representations in its public filings and

21 financial statements, the vast majority of the stock options Juniper issued from July 1999 through

22 2003 were backdated rather than granted at market value on the date of the grant. Backdating

23 provided the grantees, including Berry (and the other Officer Defendants), with built-in, instant

24 gains and compensation that was not reported to the IRS. The misconduct was concealed because

25 the practices breached the Company's Stock Option Plans, and because disclosure would have

26 subjected Juniper to accounting treatment that would have reduced earnings by hundreds of millions

27 of dollars, and would have subjected the recipients of backdated options to higher income taxes.

28

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Juniper's Stock Option Plans**

66.    The 1996 Plan provided generally that options should be set at "fair market value" on the date of grant. "Fair market value" for publicly traded securities such as Juniper common stock is the closing market price on the last trading day prior to the grant.

67.    Paragraph 8 of the 1996 Plan provided in relevant part:

**Option Exercise Price and Consideration.**

(a)    The per share exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator, but shall be subject to the following:

(i)    In the case of an Incentive Stock Option

(A)    granted to an Employee who, at the time of grant of such Option, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

(B)    granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per share on the date of grant.

(ii)    In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator [*i.e.*, the Board or Compensation Committee]. In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the [Internal Revenue] Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant.

(Emphasis added.)

68.    The 2000 Plan provided that "the exercise price for the Shares to be issued upon exercise of an Option shall be such price as is determined by the Administrator." However, the Juniper Defendants repeatedly represented in the Company's public filings from 1999 through the end of the Class Period, including the Company's audited financial statements, that "the exercise price of the Company's stock options equals the market price of the underlying stock on the date of grant," and that no stock options "have been granted for less than fair market value on the date of grant." (Emphasis added.)  As demonstrated herein, these representations were false. More than

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  110 million stock options were granted to the Officer Defendants and other Juniper officers,

2  directors and employees at prices less than the market prices on the actual dates of grant.

3  **Accounting and Tax Treatment of Stock Options**

4      69.    Juniper's stated policy of issuing at-the-money stock options, *i.e.*, options with an

5  exercise price set at the market price on the grant date, under its Stock Option Plans was designed to

6  enable the Company to receive favorable treatment under then-existing IRS rules and generally

7  accepted accounting principles ("GAAP").

8      70.    Options are a form of employee compensation. Prior to January 1, 2006, issuers

9  typically accounted for options-related compensation expenses pursuant to the "intrinsic value

10  method" described in APB No. 25. Under the intrinsic value method, the compensation expense

11  attributed to a stock option grant was calculated as the difference between: (a) the exercise price and

12  (b) the quoted market price of the underlying stock on the measurement date, which is defined as the

13  "first date on which are known both (1) the number of shares that an individual employee is entitled

14  to receive and (2) the option [exercise] or purchase price, if any." Pursuant to its Stock Option

15  Plans, the measurement dates for Juniper's stock option grants were the dates the grants were

16  formally approved and documented by the Board or its designated committees.

17      71.    Under APB No. 25, the issuer was not required to recognize any compensation-

18  related expense for the option if the issuer granted an at-the-money option with an exercise price

19  equal to the quoted market price of the stock on the grant date. In fact, the issuer could provide

20  compensation to its executives without incurring any related compensation expense for the life of

21  the option as long as grants were priced either at the money or above the market price on the grant

22  date. This benefit was particularly important to Juniper and high-tech start-up companies, which

23  needed cash for product development and expansion, and relied heavily on stock options to attract

24  and/or retain employees for their rapidly growing workforces during the late 1990's and early

25  2000's.

26      72.    In contrast, an issuer that granted an in-the-money option, *i.e.*, an option with an

27  exercise price *below* the market price of the stock on grant date, was not eligible for favorable

28  treatment. Under APB No. 25, if the stock's market price on the date of grant exceeds the exercise

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  price of the option, the company was required to recognize the difference as an expense during the

2  vesting period, which directly reduced the issuer's net income.

3  73.    In October 1995, the Financial Accounting Standards Board ("FASB") offered an

4  alternative method for valuing stock-based awards, FAS Statement 123, "Accounting for Stock-

5  Based Compensation." FAS 123 allowed issuers to either continue valuing options using the

6  intrinsic value method, or use the "fair value" method and employ option pricing models such as the

7  Black-Scholes pricing model. An issuer continuing to use APB No. 25's intrinsic value method was

8  required to disclose in the footnotes to its financial statements a pro forma income calculation of the

9  compensation expense that would have been incurred using the fair value method.

10  74.    Over the next decade, Juniper and the vast majority of companies continued to use

11  APB No. 25's intrinsic value method in connection with option grants, because using the fair value

12  accounting method would have required that some compensation expenses be recorded, as compared

13  to the intrinsic value method, where no compensation expenses were required to be recorded for at-

14  the-money options.

15  75.    As reflected in Juniper's annual and quarterly financial statements from 1999 through

16  2005, the differential in reported earnings under the intrinsic value and the fair value accounting

17  methods aggregated hundreds of millions of dollars. Specifically, the Company's earnings would

18  have been reduced from 2001 through 2005 by a total of $464.6 million under FAS 123's alternative

19  accounting methodology. Accordingly, the Defendants were well aware of the importance to

20  Juniper's bottom line of satisfying the requirements of APB No. 25.

21  76.    Juniper was also entitled to take tax deductions under the Internal Revenue Code

22  ("IRC") for at-the-money options, but was not eligible for this favorable tax treatment if the options

23  were granted in-the-money. IRC Section 162(m), 28 U.S.C. § 162(m) ("Section 162(m)"), provided

24  that compensation in excess of $1 million per year (including gains on stock options) paid to a

25  corporation's five most highly compensated officers was tax-deductible only if certain conditions

26  were met. One of those conditions was that the compensation must be payable solely for the

27  attainment of one or more performance goals, such as increasing the value of the Company's stock

28  in the future. In-the-money options were not deductible under Section 162(m) because such grants

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  lacked the necessary performance-based element. As such, Juniper and other companies that

2  backdated options face the prospect of paying significant sums to revise prior years' tax returns, plus

3  interest and penalties.

4      77.    In this case, Juniper did not expense stock option compensation to Juniper officers

5  and employees, even though the backdated stock options were priced below the fair market value of

6  the Company's stock at the dates of grant and issuance. As a result, Juniper's financial statements

7  materially inflated margins and earnings in violation of GAAP, which ultimately required the

8  Company to take a $900 million charge to account for compensation expenses and restate its

9  financial results.

10      78.    Additionally, each recipient of an in-the-money option was required to report as

11  income and pay income tax on the in-the-money option grants. Berry (and the other Officer

12  Defendants) and the other recipients underreported their incomes as a result of the wrongful scheme.

13      79.    IRC § 409A was enacted to target deferred compensation schemes, including in-the-

14  money option grants. Under § 409A, in-the-money options granted prior to October 2004 which

15  vest after December 31, 2004 are taxed at the time they vest, whether or not they are exercised.

16  Moreover, violating IRC § 409A triggers a 20 percent excise tax penalty in addition to the

17  immediate income tax. In-the-money option grantees are also potentially subject to an additional 20

18  percent accuracy-related penalty.

19
20  ### The Stock Option Committee
### Systematically Backdates Stock Option Grants

21  **The SOC**

22      80.    On July 21, 1999, Juniper's Board of Directors created the Stock Option Committee,

23  which, as described in certain of the Company's Proxy Statements, was comprised of Chief

24  Executive Officer Kriens and Chief Financial Officer Gani. Throughout her tenure at Juniper, Berry

25  also served as a member of the SOC.

26      81.    The SOC held few, if any, meetings. Rather, Berry was placed in charge of

27  overseeing Juniper's stock option granting process, including supervising Juniper's stock

28  administrator. From mid-1999 through 2003, Berry systematically backdated Juniper stock option

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  grants to dates in the past when Juniper's closing stock price was lower. Berry then routinely

2  created backdated "minutes" for purported SOC meetings that never occurred. For each purported

3  "meeting" of the SOC, Berry either gave the minutes to the other SOC members (*i.e.*, defendants

4  Kriens and Gani) for signature or stamped the minutes with a signature stamp Berry maintained

5  bearing the other SOC members' signatures.

6      82. Once Berry selected a backdated grant date and a corresponding exercise price, she

7  informed Juniper's stock administrator, who then entered the grants into Juniper's stock option

8  tracking software using the backdated date as the grant date. Juniper did not record an expense

9  related to the in-the-money options.

10 **The SOC Backdates New Hire Stock Option Grants**

11     83. Beginning in the second half of 1999, Berry routinely prepared backdated stock

12 option grants to recently hired Juniper employees. For these new hire grants, Berry collected the

13 names of recently hired employees and had lists prepared. She then selected as the exercise price of

14 the new hire grants the closing price of Juniper shares on a date in the past, reflecting the low

15 closing price during a particular period around the time the employees were hired.

16     84. For each backdated grant from 1999 through 2003, Berry then created Stock Option

17 Committee meeting "minutes" falsely representing that the SOC had met and granted options on the

18 date of the low closing price. By manipulating the grant dates, the minutes gave the appearance that

19 (a) the grants complied with Juniper's Stock Option Plans and public representations that the

20 Company did not grant in-the-money options, and (b) Juniper was not required to record

21 compensation expenses in connection with the option grants.

22     85. Berry signed the backdated committee "minutes" as a SOC member. In addition, the

23 minutes of the fictitious meetings were "signed" by Gani and Kriens, either manually or with the

24 facsimile stamps they permitted Berry to utilize.

25     86. For example, Juniper granted options to six new Juniper employees on the purported,

26 but false, grant date of October 27, 1999. The six employees were hired on Monday, October 25,

27 1999, at which time Juniper's stock traded at $42.96 per share (adjusted for a subsequent stock

28 split). Juniper's stock price dipped to a low of $41.66 per share on Wednesday, October 27, then

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    rose to $45.94 per share by the end of the week. Acting for the SOC, Berry actually selected the

2    grant date in mid-November 1999, when Juniper's stock was trading around $47.25 per share, using

3    information about Juniper's historical closing prices for its stock during the week the employees

4    were hired.

5    87.    Similarly, Juniper granted stock options to employees hired between October 8, 2002

6    through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 per share as the

7    purported "fair market value" of the stock on the grant date. The Stock Option Committee never

8    met on January 2, 2003. Instead, Berry selected that date during mid-February 2003, when Juniper's

9    stock was trading around $9 per share. The January 2, 2003 closing price for Juniper's stock, $7.36

10    per share, used as the exercise price, was Juniper's lowest closing price of the year up to the time in

11    mid-February that Berry actually selected, and the SOC approved, the grant date.

12    88.    Using dates selected with hindsight between mid-June 1999 through the end of May

13    2003, the SOC backdated more than 50 grants to groups of new employees, which provided them

14    immediate financial gains. More than $300 million in expenses associated with in-the-money grants

15    were neither recorded nor disclosed by Juniper as a consequence of the SOC's wrongful conduct.

16    **The SOC Backdates Juniper's "Ongoing" Stock Option Grants**

17    89.    From 1999 through 2003, the Stock Option Committee also backdated retention and

18    performance-related grants on at least nine occasions to themselves and other employees and

19    officers (at times including new hires), which Juniper called "ongoing" grants. The grants were

20    numerous, consistently made at or near monthly lows and/or were just before a large increase in the

21    stock price, and made to permit the Officer Defendants and other grantees to reap large possible

22    gains (and avoid reporting to the IRS those gains as compensation). More than $200 million in

23    expenses associated with the in-the-money portion of these "pool" grants were neither recorded nor

24    disclosed by Juniper.

25    90.    For example, the SOC granted options to a large group of existing employees and

26    officers, including Kriens, Gani, and Sindhu (and to certain new hires), which it called an

27    "evergreen" grant, using the backdated grant date of October 4, 1999. The Stock Option Committee

28    did not meet on October 4, 1999, and there was no determination made to make the grant that day.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    Rather, on November 5, 1999, when Juniper's stock price traded at $45.52 per share (adjusted for a

2    subsequent stock split), Berry created fictitious SOC meeting minutes dated October 4, 1999, when

3    Juniper's stock price closed at $30.36 per share – the lowest price of that quarter to date. The grant

4    date was misrepresented in Juniper's 2000 Proxy Statement and other SEC filings, and more than

5    $100 million in expenses associated with the in-the-money portion of this "evergreen" grant were

6    neither recorded nor disclosed by Juniper.

7    91.    Specifically, Berry and the other Juniper Defendants misrepresented in the 2000

8    Proxy Statement that a total of 4,470,000 stock options (adjusted for a subsequent stock split), at a

9    (split adjusted) exercise price of $30.36 per share, had been granted to five of the Company's senior

10    executives on October 4, 1999:  Kriens; Sindhu; Gani; Steven Haley, Vice President of Worldwide

11    Sales and Service; and Peter Wexler, Vice President of Engineering. Berry drafted the 2000 Proxy

12    Statement and signed it on behalf of "The Board of Directors." In fact, the options were granted on

13    November 5, 1999, when Juniper shares closed at $45.52 per share, providing immediate gains of

14    $15.16 per share.

15    92.    Using the October 4, 1999 grant date rather than the price of Juniper shares on

16    November 5, 1999 gave Kriens, Sindhu, Gani and the two other executives an undisclosed windfall

17    totaling $67,765,200.

18

| Executive | No. of Options* | Per Share Price Difference ($) | Total Value Difference ($) |
|---|---|---|---|
| Kriens | 1,800,000 | 15.16 | 27,280,000 |
| Sindhu | 1,080,000 | 15.16 | 16,372,800 |
| Gani | 480,000 | 15.16 | 7,276,800 |
| Haley | 630,000 | 15.16 | 9,550,800 |
| Wexler | 480,000 | 15.16 | 7,276,800 |
| | 4,470,000 | | 67,757,200 |

\* Adjusted for stock splits.

25    93.    A graph illustrating the Company's trading in October and early November 1999 in

26    relation to the Company's reported versus actual grant dates is set forth below.

27

28

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220



**Juniper Networks**
**Daily Stock Prices: Oct 1, 1999 - Dec 31, 1999**

94.      Juniper also granted "pools" of stock options to certain business units to be awarded to employees based on the discretion of the business unit manager. The Stock Option Committee backdated "pool" grants Juniper made at least seven times between 2000 and 2003.

19

20

21

22

23

24

25

26

95.      For example, Juniper granted options to existing employees and senior executives, including the Officer Defendants and Sindhu (as well as some new hires), in one such "pool" grant, using the backdated grant date of December 21, 2000. Juniper's stock price closed at $93.9375 per share on December 21, 2000, which was the lowest stock price of the six months up to that date. No Stock Option Committee meeting occurred on that date; in fact, Berry left the country early in the morning of December 21, 2000. The grant was actually made in or around early January 2001, when Juniper's stock price exceeded $100 per share, but was misrepresented as December 21, 2000 in Juniper's 2001 Proxy Statement and other SEC filings.

27

28

96.      With respect to Juniper executives, Berry and the other Juniper Defendants misrepresented in the proxy statement dated March 28, 2001 (the "2001 Proxy Statement") that on

1  December 21, 2000 a total of 800,000 stock options at an exercise price of $93.9375 had been

2  granted to five Juniper senior executives, including defendants Kriens, Sindhu and Gani. Berry

3  drafted the 2001 Proxy Statement and signed it on behalf of "The Board of Directors."

4      97.    As with the prior option grants described above, the lowest closing price of Juniper's

5  stock during December 2000 occurred on December 21, the reported date of the option grants. The

6  grants were actually made in early January 2001, when Juniper shares traded at a range of $102.56

7  per share to $132 per share. Thus, the SOC's backdated options provided potential immediate gains

8  that could range from $8.62 per share to $38.06 per share.

9      98.    Backdating the option grants from early January 2001 to December 21, 2000, the date

10  Juniper shares traded at their low for December, gave the five Juniper senior executives (including

11  Defendants Kriens, Sindhu and Gani) immediate windfall gains that could range from $6,896,000 to

12  $30,448,000.

| Executive | No. of Options | Per Share Price Differences ($) | Total Value Differences ($) |
|-----------|----------------|-------------------------------|----------------------------|
| Kriens | 400,000 | 8.62 to 38.06 | 3,448,000 to 15,224,000 |
| Sindhu | 100,000 | 8.62 to 38.06 | 862,000 to 3,806,000 |
| Gani | 100,000 | 8.62 to 38.06 | 862,000 to 3,806,000 |
| Haley | 100,000 | 8.62 to 38.06 | 862,000 to 3,806,000 |
| Wexler | 100,000 | 8.62 to 38.06 | 862,000 to 3,806,000 |
| | 800,000 | | 6,896,000 to 30,448,000 |

19      99.    As described in ¶ 25, *supra*, Berry also received in-the-money stock options from

20  Juniper backdated to December 21, 2000. The number of in-the-money options received by Berry

21  on that occasion and on other occasions is as yet unknown to Plaintiff, because neither Juniper nor

22  Berry was required by the applicable SEC regulations to report publicly the grants to Berry or her

23  sales of Juniper shares.

24      100.    A graph illustrating the Company's trading in December 2000 and early January

25  2001 in relation to the Company's reported versus actual grant dates is set forth below.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220



101.    Juniper acknowledged in its 2006 Form 10-K that two option grants to Kriens prior to 2001 had purported grant dates preceding their approval dates. As noted in ¶¶ 180-82, *infra*, financial analysts at the Center for Financial Research and Analysis ("CFRA") and J.P. Morgan independently determined, based upon statistical analyses, that the 1999 and 2000 option grants received by Kriens (and other Juniper executives) had a "high-risk profile" for backdating. As Juniper granted stock options to its executives on an annual basis, it follows that the two option grants identified by the analysts as likely backdated are the same ones referenced in the 2006 Form 10-K.

102.    Moreover, the SEC complaint, which was premised on documentary evidence obtained from Juniper and its auditors and extensive deposition testimony taken during the SEC investigation, alleges that the Stock Option Committee granted numerous executives backdated in-the-money options dated October 4, 1999 and December 21, 2000.

103.    At least one of the Juniper Directors also benefitted from the mispricing of Juniper

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

stock options by the Stock Option Committee. According to his filing on SEC Form 4, on May 11, 2000, Director Sclavos received 40,000 stock options at an exercise price of $74.00 per share.

104.    The lowest closing price of the Company's stock during the month of May 2000 occurred on May 11, 2000, the reported date of the grant to Sclavos. The May 11 low of $74.00 per share followed a sharp decline from the May 1, 2000 price of $109.47 per share. The stock price rebounded less than one week after the May 11 option grant to close on May 16, 2000 at $87.53 per share, an increase of more than 18%. In five days, the options granted to Sclavos increased in value by more than $540,000.

105.    Berry also received in-the-money stock options backdated to May 11, 2000. The amount is presently unknown to Plaintiff because, as noted in ¶ 99 *supra*, the grants to Berry were never publicly reported.

106.    A graph illustrating the Company's trading from April 15, 2000 through June 15, 2000 in relation to the Company's stock options grants in 2000 is set forth below.



**Juniper Networks**
**Daily Stock Prices: Apr. 15, 2000 - June 15, 2000**

107.    Numerous facts confirm that the May 11, 2000 grants were backdated. First, the SEC

1   investigation, which was premised on documents and evidence obtained from Juniper, concluded

2   that Berry, as a member of the Stock Option Committee, granted to herself backdated in-the-money

3   stock options dated May 11, 2000. Second, Juniper belatedly admitted in the 2006 Form 10-K that

4   option grants dates were often selected "to coincide ... with a specific event, such as the

5   appointment or re-election of a director," rather than the dates the options were granted. According

6   to the 2001 Proxy Statement signed by Berry, Sclavos became a Juniper Director in May 2000, at

7   which time he received the 40,000 stock options. The foregoing is strong evidence that the May 11,

8   2000 grant to Sclavos was backdated to "coincide with [his] appointment [as] a director."

9       108.    In the spring of 2001, Juniper's stock price had declined substantially from the levels

10   experienced during 1999 and 2000. Consequently, many options awarded during those earlier years

11   had exercise prices well above the then-current stock price known as "underwater" options.

12       109.    In or about April 2001, Juniper instituted a program to award additional options to

13   existing employees using a formula based on the number of underwater options each employee then

14   had, and the length of time each had been employed by Juniper. As part of the program, Juniper

15   granted one block of this "formula" grant using as the grant date April 4, 2001, when Juniper's stock

16   price closed at $29.19 per share. The Stock Option Committee backdated the grant to April 4, which

17   was the lowest closing price of Juniper's stock during April 2001. The reported grant date of April

18   4 was selected with hindsight on or around April 19, 2001, when Juniper's stock price had more

19   than doubled to $65.68 per share.

20       110.    A graph illustrating the Company's April 2001 trading in relation to the Company's

21   stock option grants in 2001 is set forth below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220



**Juniper Networks**
**Daily Stock Prices:  April 1 - April 30, 2001**

111.    Berry and the other Juniper Defendants also misrepresented in the Company's proxy statement dated March 28, 2003 (the "2003 Proxy Statement") that a total of 1,850,000 stock options at an exercise price of $5.69 per share were purportedly granted on July 1, 2002 to defendants Kriens, Sindhu, Gani, and Lloyd Carney, Executive Vice President Operations. Although it was not reported in the Proxy Statement, according to the SEC complaint, Berry also received backdated, in-the-money options dated July 1, 2002.  Additionally, Carney was purportedly granted 1,500,000 stock options at an exercise price of $9.32 per share on February 28, 2002.  The 2003 Proxy Statement was drafted by Berry and issued on behalf of "The Board of Directors."

112.    As with the prior option grants to Juniper officers and employees, the lowest closing price of the Juniper shares during July 2002 occurred on July 1, the reported date of the grants to the Officer Defendants and their colleagues.  By July 8, 2002, one week after the purported grants, the price of Juniper stock had increased more than 27% to $7.25 per share.  On July 31, 2002, Juniper's shares had increased to $9.21 per share, a 62% gain from the July 1 price.

113.    A similar pattern occurred with respect to the 1.5-million-option reported grant to

1  Carney on February 28 occurred on the date when Juniper shares hit their low for the month at $9.32

2  per share. By March 8, 2002, the stock had risen to $13.31 per share, a gain of more than 40% in

3  eight days.

4      114.    A graph illustrating the February through July 2002 trading in Juniper stock in

5  relation to the Company's grants of stock options is set forth below:



20      115.    The table below shows the reported stock option grants and compares their respective

21  values as of their February 28, 2002 and July 1, 2002 grant dates with their respective values on

22  March 8 and July 17, 2002, and evidences $13 million of potential gains in value reaped by these

23  executives (excluding Berry, whose grant amount is presently unknown to Plaintiff) as a result of the

24  precipitous rises in Juniper's stock price in a very short time frame.

| Date | Executive | No. of Options | Per Share Price Difference ($) | Total Value Difference ($) |
|------|-----------|----------------|-------------------------------|----------------------------|
| 7/1/2002 | Kriens | 550,000 | 3.52 | 1,936,000 |
| 7/1/2002 | Sindhu | 300,000 | 3.52 | 1,056,000 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

| Date | Executive | No. of Options | Per Share Price Difference ($) | Total Value Difference ($) |
|------|-----------|----------------|--------------------------------|----------------------------|
| 7/1/2002 | Gani | 500,000 | 3.52 | 1,760,000 |
| 7/1/2002 | Carney | 500,000 | 3.52 | 1,760,000 |
| | | 1,850,000 | 3.52 | 6,512,000 |

| Date | Executive | No. of Options | Per Share Price Difference ($) | Total Value Difference ($) |
|------|-----------|----------------|--------------------------------|----------------------------|
| 2/28/2002 | Carney | 1,500,000 | $ 4.33 | 6,500,000 |

116.    Numerous facts confirm that the February 28, 2002 and July 1, 2002 grants were backdated. First, the SEC investigation, which was premised on documents and evidence obtained from Juniper, concluded that Berry, as a member of the Stock Option Committee, had issued to herself and others backdated options dated July 1, 2002.

117.    Second, Juniper admitted in its 2006 Form 10-K that the Company improperly accounted for stock options for 1,500,000 shares issued in connection with the hiring of an unidentified Juniper executive. Specifically, the Company acknowledged there was no support for using the reported grant date as the date of approval because the grant had not been approved by the Compensation Committee or the Board of Directors in minutes of a meeting or in an action by unanimous written consent. As a result, the Company was required to record a $6.5 million compensation charge for this option grant using the executive's employment commencement date as the measurement date for when the options were actually "approved."

118.    Juniper's referenced $6.5 million charge related to the February 28, 2002 grant of 1.5 million stock options to Lloyd Carney, described in ¶¶ 111 and 115, *supra*. Juniper's 2003 Proxy Statement states under the heading "Executive Compensation": "Mr. Carney was granted an option for 1,500,000 shares upon his employment with the Company at an exercise price of $9.32 per share." There were no other option grants of 1,500,000 shares to newly hired executives reported from 1999 through 2004, the period of admitted wrongdoing.

119.    The Proxy Statement dated April 12, 2004 (the "2004 Proxy Statement") misrepresented that a total of 2,350,000 stock options at an exercise price of $15.00 per share had purportedly been granted on September 26, 2003 to five of the Company's executive officers:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 Kriens; Sindhu; Gani; James A. Dolce, Jr., Executive Vice President Field Operations; and Ashok
2 Krishnamurthi ("Krishnamurthi"), Vice President Engineering. An additional 37,500 stock options
3 at an exercise price of $8.16 per share were purportedly granted to Krishnamurthi on April 1, 2003.
4 Although it was not reported in the 2004 Proxy Statement, based on its investigation, the SEC
5 determined that backdated stock options were also granted to Berry on March 12, 2003.

6     120.    As with the prior options grants described above, the lowest closing price of
7 Juniper's stock during September 2003 occurred on September 26, 2003, the reported date of the
8 option grants at $15.00 per share. This price represented a drop from the $17.30 per share closing
9 price on September 2, 2003. Within ten trading days following the purported option grants,
10 Juniper's stock price more than fully recovered from its temporary dip, rising 23% to close at $18.40
11 per share on October 9, 2003.

12     121.    Similarly, the lowest closing price of Juniper's stock during April 2003 occurred on
13 April 1, 2003, the reported date of the stock option grant at $8.16 per share to Krishnamurthi. By
14 April 15, Juniper's stock had increased 22% to close at $9.98 per share, and the price continued to
15 rise to a closing price of $10.24 per share on April 30, 2003, more than 25% higher than its price on
16 the date the option was purportedly granted.

17     122.    A graph illustrating the trading in Juniper stock in relation to the Company's reported
18 April 2003 and September 2003 grants of stock options is set forth below.



123.    The table below shows the option grants on April 1, 2003 and September 26, 2003 and compares their respective values on April 30 and October 9, 2003, and evidences a potential increase in value of over $8.5 million as a result of the opportune rise in Juniper's stock price.

| Date | Executive | No. of Options | Per Share Price Difference ($) | Total Value Difference ($) |
|------|-----------|----------------|-------------------------------|----------------------------|
| 9/26/2003 | Kriens | 800,000 | 3.40 | 2,720,000 |
| 9/26/2003 | Sindhu | 300,000 | 3.40 | 1,020,000 |
| 9/26/2003 | Gani | 500,000 | 3.40 | 1,700,000 |
| 9/26/2003 | Dolce | 500,000 | 3.40 | 1,700,000 |
| 9/26/2003 | Krishnamurthi | 250,000 | 3.40 | 850,000 |
| | | 2,350,000 | | 7,900,000 |

| Date | Executive | No. of Options | Per Share Price Difference ($) | Total Value Difference ($) |
|------|-----------|----------------|-------------------------------|----------------------------|
| 4/1/2003 | Krishnamurthi | 37,500 | 2.08 | 636,480 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

124.    Juniper's 2000 through 2003 Proxy Statements, drafted by Berry, contained several false and misleading representations, including that (a) stock options were granted at fair market value on the dates of the grants; (b) stock options would not provide value to executives unless the price of Juniper stock increased above the exercise price; (c) the option grants were administered and monitored in accordance with the Stock Option Plans; and (d) the stock options were granted to align the interests of investors and shareholders with those of Juniper's executives by linking a significant portion of the insider's compensation to the future performance of the Company, when in fact most option grants were in-the-money when issued.

125.    The reported grant dates and compensation received by Kriens, Gani, and Sindhu and other Juniper executives, purportedly in accordance with the Company's Stock Option Plans, were also materially false and misleading.

126.    Juniper's financial statements during this period were inflated due to the improper accounting for in-the-money stock option grants, which understated Juniper's compensation costs, inflated the Company's operating margins and income, and resulted in adverse tax consequences. Berry was integrally involved in drafting, reviewing, and/or discussing Juniper's financial results contained in SEC reports and earnings releases.

### 1.    The False Proxy Statements

127.    Each of the Company's proxy statements for years 2000 through 2003 included a "Compensation Committee Report on Executive Compensation" that falsely represented:

> **Stock Option Grants**.  Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. Stock Options are granted at the fair market value on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

(Emphasis added.)

128.    Similarly, the 2000 Proxy Statement included a table titled "Option/SAR Grant in Last Fiscal Year" setting forth the details of the stock options granted in 1999 to the named

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    executive officers and the potential realizable value, assuming an annual appreciation of either 5%

2    or 10%. Footnote (2) to that table falsely represented: "Options were granted at an exercise price

3    equal to the fair market value of the Company's common stock, as determined in good faith by the

4    Board of Directors. As of the effective date of the initial public offering, options are granted at fair

5    market value on the date of the grant." (Emphasis added.)

6    129.    Likewise, Note 2 to the table entitled "Option/SAR Grants In Last Fiscal Year,"

7    contained in Juniper's 2001 Proxy Statement misrepresented that "Options are granted at fair market

8    value on the date of grant." The 2001 Proxy Statement, as with the other proxy statements issued by

9    Juniper during Berry's tenure, was drafted by her and signed on behalf of "The Board of Directors."

10   130.    The 2002 Proxy Statement responded to a shareholder proposal concerning Juniper's

11   repricing (or regranting) of stock options by falsely representing, *inter alia*, that employees at

12   Juniper who had been awarded stock options "have a right to purchase stock in the future at a price

13   which is the fair market value on the date of the stock option grant."

14   131.    The representations in ¶¶ 127-30 were materially false and misleading in failing to

15   disclose that from June 1999 through 2003, Juniper had issued backdated in-the-money stock

16   options to Company officers, directors, and employees who received immediate gains in value

17   because the exercise prices of the options were below the market prices on the dates of the grants.

18   132.    The Compensation Committee Reports in the Company's Proxy Statements for 2000

19   through 2003 also contained a substantially similar discussion of the purpose and administration of

20   the stock option plan. For example, the 2003 Proxy Statement represented:

21           The Compensation Committee's approach is predicated upon the
             philosophy that a substantial portion of aggregate annual
22           compensation for executive officers should be contingent upon the
             Company's performance and an individual's contribution to the
23           Company's success in meeting certain critical objectives. In addition,
             the Compensation Committee strives to align the interests of the
24           Company's executive officers with the long-term interests of
             stockholders through stock option grants such that grants of stock
25           options should relate the performance of the executive to the market
             perception of the performance of the Company [*i.e.*, the stock price].
26

27   (Emphasis added.)

28   133.    The foregoing representations were materially misleading in failing to disclose the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  facts concerning the backdating and systematic in-the-money option grants from June 1999 through

2  2003.

3    134.    The Summary Compensation Table included in the 2000-2003 Proxy Statements

4  materially understated the compensation received from the Company by the Officer Defendants and

5  other Juniper officers and directors from 1999 through 2003 as a result of their receipt of

6  fraudulently backdated stock options at less than fair market value.

7    135.    Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation

8  Table include the "dollar value of [any] bonus (cash and non-cash) earned by the named executive

9  officer during the fiscal year covered." 17 C.F.R. § 229.402(b)(2)(iii)(B).  Additionally, the

10  Instructions to Item 402(b)(2)(iii)(A) and (B) further required that the following items be disclosed

11  in the Summary Compensation Table:

> i.    For stock or any other form of non-cash compensation,
> disclose the fair market value at the time the compensation is awarded,
> earned or paid.
>
> ii.    Above-market earnings or preferential earnings on restricted
> stock, options, SARs or deferred compensation paid during the fiscal
> year or payable during that period. . . .
>
> iii.    The dollar value of the difference between the price paid by a
> named executive officer for any security of the registrant or its
> subsidiaries purchased from the registrant or its subsidiaries (through
> deferral of salary or bonus, or otherwise), and the fair market value of
> such security at the date of purchase, unless that discount is available
> generally, either to all security holders or to all salaried employees of
> the registrant.

20    136.    The disclosures of "Annual Compensation" and "Securities Underlying Options" in

21  the Juniper Proxy Statements were materially misleading absent the disclosure of the additional

22  compensation received by the Officer Defendants and other officers and directors as a result of their

23  receipt of backdated, in-the-money options.

24    137.    The Option/SAR Grants In Last Fiscal Year tables in the 2000 through 2003 Proxy

25  Statements were also materially misleading because they failed to include an additional column

26  showing the market prices on the dates of the backdated, in-the-money option grants, as required by

27  Item 402(c)(2)(iv).  Finally, the Proxy Statements were misleading in failing to disclose that the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

options grants were backdated in light of Item 402(c)(3), which required the disclosure of the material terms of option grants.

## 2.   The False Financial Statements

### a.   Pre-Class Period

138.   Juniper has admitted in the 2006 Form 10-K that from its inception as a public company in June 1999, the Company's financial results reported in its SEC filings and earnings releases were materially inflated because Juniper failed to record compensation expenses related to the in-the-money grants of stock options.

139.   Berry substantially participated in the disclosures included or incorporated by reference in the following false SEC reports and earnings releases issued by Juniper prior to the beginning of the Class Period: Form 10-Ks filed on March 29, 2000, March 27, 2001, and April 1, 2002; Form 10-Qs filed on July 30, 1999, October 29, 1999, May 12, 2000, August 10, 2000, November 9, 2000, May 8, 2001, August 6, 2001, November 1, 2001, May 15, 2002, August 14, 2002, and November 7, 2002; earnings releases dated July 20, 1999, October 19, 1999, January 18, 2000, April 13, 2000, July 13, 2000, October 12, 2000, January 16, 2001, April 12, 2001, July 12, 2001, October 11, 2001, January 15, 2002, April 11, 2002, July 11, 2002, and October 10, 2002; and registration statements on Form S-8 dated March 14, 2000, August 18, 2000, December 12, 2000, March 29, 2001, December 21, 2001, and July 8, 2002.

### b.   Class Period

140.   During the Class Period, Berry substantially participated in the disclosures relating to stock options and executive compensation and internal controls included in the Company's SEC reports and earnings releases.

#### Fiscal Year 2002

141.   On January 16, 2003, the Company issued a press release entitled "Juniper Networks, Inc. Reports Q4 '02 and Year End 2002 Financial Results: Q4 '02 Net Revenue $155.3M; Pro forma EPS $0.01; 2002 Net Revenue $546.5M; Pro Forma EPS $(0.01)" (the "2002 Release"). The 2002 Release stated in relevant part:

> Actual net income for the fourth quarter, which includes amortization

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

of purchased intangibles, a deferred compensation credit and change in an estimated restructuring charge, was $8.5 million or $0.02 per share, compared with a net loss of $5.1 million or $0.02 per share in the fourth quarter of 2001.

Net revenues for the year ended December 31, 2002 were $546.5 million, compared with $887.0 million for the year ended December 31, 2001. Pro forma net loss for 2002 was $4.8 million or $0.01 per share, compared on the pro forma net income of $169.9 million or $0.50 per share during 2001. Actual net loss for 2002 was $119.6 million or $0.34 per share, compared with $13.4 million or $0.04 per share during 2001.

142.    On March 10, 2003, Juniper filed with the SEC a Report on Form 10-K for the year ended December 31, 2002 (the "2002 Form 10-K"). In the 2002 Form 10-K, Juniper reported a net loss of $119.6 million or $.34 per share for 2002, compared to a loss of $13.4 million in 2001 or $.04 per share for 2001. Juniper directors and/or officers Gani, Kriens, Sindhu, Sclavos, Hearst, Khosla, and Stensrud signed the 2002 Form 10-K.

143.    The 2002 Form 10-K included the Company's audited consolidated balance sheets and statements of operations for each of the three years ended December 31, 2002. At Note 2 to the 2002 financial statements, the Company reported that it had accounted for stock option grants under the intrinsic value recognition and measurement principles of APB No. 25 and related interpretations. Juniper falsely represented that because "the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, or other than acquisition-related compensation is recognized in net income." (Emphasis added.) Virtually identical misrepresentations were made in Note 10 under the heading "Stock-Based Compensation."

144.    The Company described its purported practice under both the 1996 Plan and the 2000 Plan of issuing all stock options at their fair-market value on the date of grant in Note 10 to the 2002 financial statements as follows:

The Company's Amended and Restated 1996 Stock Option Plan (the "1996 Plan") provides for the granting of incentive stock options to employees and nonstatutory stock options to employees, directors and consultants. Incentive stock options are granted at an exercise price of not less than the fair value per share on the date of grant. Nonstatutory stock options may be granted at an exercise price of not less than 85% of the fair value per share on the date of grant; however,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    no nonstatutory stock options have been granted for less than fair
     market value on the date of grant.
2
                                    *       *       *
3

4    In July 2000, the Board of Directors adopted the Juniper Networks
     2000 Nonstatutory Stock Option Plan (the "2000 Plan"). The 2000
5    Plan provides for the granting of nonstatutory stock options to
     employees, directors and consultants. Nonstatutory stock options may
     be granted at an exercise price of not less than 85% of the fair value
6    per share on the date of grant; however, no nonstatutory stock options
     have been granted for less than fair market value on the date of grant.
7

8    (Emphasis added.)

9        145.    Juniper also falsely represented in the 2002 Form 10-K that the Company had

10   concluded that as of December 31, 2002, Juniper Network's internal controls over financial

11   reporting were effective and that there were no significant changes in the Company's internal

12   controls or in other factors that could significantly affect these controls.

13       146.    Kriens and Gani signed certifications pursuant to SOX, which were attached as

14   exhibits to the 2002 Form 10-K. Kriens and Gani each certified that they were responsible for

15   establishing and maintaining disclosure controls and procedures and had:

16           a.      designed such disclosure controls and procedures to ensure
         that material information relating to the registrant, including its
17       consolidated subsidiaries, is made known to us by others within those
         entities, particularly during the period in which this annual report is
18       being prepared;

19           b.      evaluated the effectiveness of the registrant's disclosure
         controls and procedures as of a date within 90 days prior to the filing
20       date of this annual report (the "Evaluation Date"); and

21           c.      presented in this annual report our conclusions about the
         effectiveness of the disclosure controls and procedures based on our
22       evaluations as of the Evaluation Date.

23       147.    Kriens and Gani also certified that they had disclosed, based on their most recent

24   evaluation, to the registrant's auditors and the audit committee of Juniper's Board of Directors (or

25   person performing the equivalent function):

26           a.      significant deficiencies in the design or operation of internal
27       controls which could adversely affect the registrant's ability to record,
         process, summarize and report financial data and have identified for
28       the registrant's auditors any material weaknesses in internal controls;

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

b.      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

c.      significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of the most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

148.    The foregoing statements concerning Juniper's 4Q 2002 and 2002 year-end financial results, stock option granting and recording practices, compensation practices, and internal controls were materially false and misleading for the reasons set forth herein at ¶¶ 7, 9, 65, 77-78, and 174.

### Fiscal Year 2003

149.    On April 10, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended March 31, 2003 (the "1Q 2003 Press Release"). The 1Q 2003 Press Release was attached as an exhibit to a Juniper Form 8-K dated April 10, 2003, and stated in relevant part:

> GAAP net income for the first quarter was $3.7 million or $0.01 per share, compared with a net loss of $46.0 million or $0.14 per share in the first quarter of 2002. Non-GAAP net income, which excludes amortization of purchased intangibles and deferred compensation and a gain on the sale of investments, was $6.3 million or $0.02 per share, compared with non-GAAP net income of $0.4 million or $0.00 per share in the first quarter of 2002.

150.    On May 8, 2003, Juniper filed with the SEC a Report on Form 10-Q for the third quarter ended March 31, 2003 (the "1Q 2003 10-Q"). It reiterated the financial results in the 1Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP. The 1Q 2003 10-Q was signed by defendant Gani.

151.    The Company's accounting treatment of stock-based compensation was falsely described in Note 2 to the 1Q 2003 consolidated financial statements as follows:

> **Stock Based Compensation**
>
> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related Interpretations. <u>As the exercise price of all options granted under these plans was equal to the market price of the underlying</u>

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

> common stock on the grant date, no stock-based employee
> compensation cost, other than acquisition-related compensation, is
> recognized in net income [loss].

(Emphasis added.)

152.    Defendants Kriens and Gani signed certifications pursuant to SOX, which were attached as exhibits to the 1Q 2003 10-Q. The certifications falsely represented that (a) the 1Q 2003 10-Q fairly presented in all material respects the financial condition and results of operations of Juniper, and (b) they had inspected the Company's disclosure and internal financial reporting controls and had found them to be effective "in timely alerting them to material information relating to the Company . . . required to be included in our Exchange Act filings."

153.    The foregoing statements concerning Juniper's 1Q 2003 financial results, stock option practices, and internal controls were materially false and misleading, for the reasons set forth herein at ¶¶ 7, 9, 65, 77-78, and 174.

154.    On July 10, 2003, Juniper issued a press release announcing its purported financial results for the quarter ended June 30, 2003 (the "2Q 2003 Press Release"). The 2Q 2003 Press Release was attached as an exhibit to a Juniper Form 8-K dated July 10, 2003, and stated in relevant part:

> GAAP net income for the second quarter was $13.6 million or $0.03
> per share, compared with a GAAP net income of $6.2 million or $0.02
> per share in the second quarter of 2002. Non-GAAP net income,
> which excludes an adjustment to the purchase price of an acquisition,
> the amortization of purchased intangibles and deferred compensation,
> the gain on the sale of investments and the gain on the partial
> retirement of the convertible subordinated notes was $10.3 million or
> $0.03 per share, compared with non-GAAP net income of $0.4 million
> or $0.00 per share in the second quarter of 2002.

155.    On August 7, 2003, Juniper filed with the SEC a Report on Form 10-Q for the second quarter ended on June 30, 2003 (the "2Q 2003 10-Q"). It reiterated the false financial results in the 2Q 2003 Press Release and represented that the financial results and related disclosures were prepared in accordance with GAAP. The 2Q 2003 10-Q was signed by defendant Gani.

156.    The Company's accounting treatment of stock-based compensation was falsely described in Note 2 to the 2Q 2003 consolidated financial statements as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

2

**Stock Based Compensation**

3

4

5

6

> The Company's stock option plans are accounted for under the intrinsic value recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees" and related Interpretations. As the exercise price of all options granted under these plans was equal to the market price of the underlying common stock on the grant date, no stock-based employee compensation cost, other than acquisition-related compensation, is recognized in net income (loss).

7

8

(Emphasis added.)

9

157.    The 2Q 2003 10-Q contained certifications by CEO Kriens and CFO Gani, pursuant

10

to SOX, falsely representing that (a) the 2Q 2003 10-Q accurately portrayed Juniper's financial

11

condition, and was not materially false or misleading, and (b) they had inspected the Company's

12

disclosure and internal financial reporting controls and had found them to be effective "in timely

13

alerting them to material information relating to the Company . . . required to be included in our

14

Exchange Act filings."

15

158.    The foregoing statements concerning Juniper's 2Q 2003 financial results, stock

16

option and compensation practices, and internal controls were materially false and misleading, for

17

the reasons set forth herein at ¶¶ 7, 9, 65, 77-78, and 174.

18

159.    On October 9, 2003, Juniper issued a press release announcing its purported financial

19

results for the quarter ended September 30, 2003 (the "3Q 2003 Press Release"). The 3Q 2003 Press

20

Release was attached as an exhibit to a Juniper Form 8-K dated October 9, 2003, and stated in

21

relevant part:

22

23

24

25

26

> GAAP net income for the third quarter was $7.2 million or $0.02 per share, compared with a GAAP net loss of $88.3 million or $0.24 per share in the third quarter of 2002.  Non-GAAP net income, which excludes restructuring expenses, in-process research and development expenses, integration expenses, the amortization of purchased intangibles and deferred compensation, the write-down of investments and the gain on the partial retirement of the 4.75% Convertible Subordinated Notes was $14.7 million or $0.04 per share, compared with non-GAAP net loss of $8.4 million or $0.02 per share in the third quarter of 2002.

27

28

160.    On or about November 14, 2003, Juniper filed with the SEC a Report on Form 10-Q

SCHUBERT & REED LLP<br>Three Embarcadero Center, Suite 1650<br>San Francisco, CA 94111<br>(415) 788-4220

1  for the third quarter ended September 30, 2003 (the "3Q 2003 10-Q"). It reiterated the false

2  financial results in the 3Q 2003 Press Release and represented that the financial results and related

3  disclosures were prepared in accordance with GAAP. The 3Q 2003 10-Q was signed by defendant

4  Gani.

5      161.    The Company's accounting treatment of stock-based compensation was falsely

6  described in Note 2 to the 3Q 2003 consolidated financial statements as follows:

**Stock Based Compensation**

The Company's stock option plans are accounted for under the
intrinsic value recognition and measurement principles of APB
Opinion No. 25, "Accounting for Stock Issued to Employees" and
related interpretations. As the exercise price of all options granted
under these plans was equal to the market price of the underlying
common stock on the grant date, no stock-based employee
compensation cost, other than acquisition-related compensation, is
recognized in net income (loss).

13  (Emphasis added.)

14      162.    The 3Q 2003 10-Q contained certifications pursuant to SOX by CEO Kriens and

15  CFO Gani, falsely representing that (a) the 3Q 2003 10-Q accurately portrayed Juniper's financial

16  condition, and was not materially false or misleading, and (b) they had inspected the Company's

17  disclosure and internal financial reporting controls and had found them to be effective.

18      163.    The foregoing statements concerning Juniper's 3Q 2003 financial results, stock

19  option and compensation practices, and internal controls were materially false and misleading, for

20  the reasons set forth herein at ¶¶ 7, 9, 65, 77-78, and 174.

21      **The Notes Offering**

22      164.    On November 20, 2003, Juniper issued $400 million principal amount of Notes

23  pursuant to the Notes Registration Statement.

24      165.    The Notes were originally issued in private placements in May and June 2003 which

25  were exempt from registration under SEC Rule 144A. The private placement notes were

26  subsequently registered pursuant to the Notes Registration Statement, and sold by their holders to

27  the public investors.

28      166.    Berry was integrally involved with the preparation of the Notes Registration

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  Statement.  She was listed on the cover of the initial Form S-3 and amendments thereto as the

2  designated contact of the Registrant (*i.e.*, Juniper), and signed the Notes Registration Statement as

3  "Attorney-In-Fact" for Kriens, Gani, Sindhu, Hearst, Khosla, Levy, Sclavos, and Stensrud.

4  167.  The Notes are convertible to shares of Juniper common stock, subject to certain

5  adjustments, at a rate of 49.6512 shares of common stock per $1000 principal amount of notes, the

6  equivalent of a conversion price of approximately $20.14 per share.  Because of the conversion

7  feature, the market price of the Notes is directly related to the price of Juniper common stock.

8  168.  The Notes Registration Statement reported on Juniper's financial condition and stated

9  that the Company's ratio of earnings to fixed charges was 1.99, based on its financial results for the

10  nine months ended September 30, 2003.

11  169.  The Notes Registration Statement also incorporated by reference Juniper's audited

12  consolidated financial statements contained in the 2002 Form 10-K and the quarterly reports on

13  Form 10-Q for the periods ended March 31, 2003, June 30, 2003, and September 30, 2003.

14  170.  For the reasons set forth herein at ¶¶ 7, 9, 65, 77-78, and 174, the financial statements

15  for 2002 and the interim periods for 2003 which were summarized and incorporated by reference in

16  the Notes Registration Statement were materially false and misleading in failing to disclose, *inter*

17  *alia*, the true facts concerning the backdating and mispricing of stock option grants, and to record

18  compensation expenses for those grants, thereby inflating Juniper's earnings.

19  171.  For the same reasons, the Company's ratio of earnings to fixed charges, based upon

20  results for the nine months ended September 30, 2003, was also inflated.

21  172.  Juniper issued restated 2002 and 2003 financial results in its 2006 Form 10-K to

22  account properly for the compensation expenses associated with the mispriced and erroneously

23  recorded stock option grants.

### Fiscal Years 2004 Through 2006

25  173.  The failure to record compensation expenses relating to the grant of in-the-money

26  options from June 1999 through 2003 continued to inflate Juniper's financial results through mid-

27  2006, as those options vested.  The false financial reports were contained or incorporated by

28  reference in numerous SEC filings and earnings releases, including Form 10-Ks filed February 20,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  2004, March 4, 2005, and March 7, 2006; Form 10-Qs filed May 3, 2004, August 5, 2004,

2  November 2, 2004, April 28, 2005, April 29, 2005, August 2, 2005, November 3, 2005, and May 8,

3  2006; earnings releases dated January 15, 2004, April 21, 2004, July 13, 2004, October 14, 2004,

4  January 18, 2005, April 19, 2005, July 19, 2005, October 19, 2005, January 25, 2006, and April 19,

5  2006; and the registration statement on Form S-4 filed on March 10, 2004 in connection with the

6  NetScreen merger.

7       174.    The foregoing statements set forth above under the heading "The False Financial

8  Statements" concerning Juniper's financial results, stock options and compensation practices, and

9  internal controls were each materially false and misleading because they misrepresented or omitted

10  the following material adverse facts, among others:

   a.   Contrary to the affirmative representations in Juniper's public filings, stock options issued to Juniper employees under the Stock Option Plans were not issued at the fair market value of the Company's stock on the date of the grant; rather, option grant dates were manipulated at least from June 1999 through mid-2003 to coincide with particularly low share prices so as to benefit the Officer Defendants and other Company officers, directors and employees;

   b.   the Company had not consistently followed the dictates of APB No. 25 in that (i) options priced below a stock's fair market value when awarded constituted immediate gains to the grantees; and (ii) Juniper did not treat these gains as a cost to the Company, thereby inflating its earnings;

   c.   Company officers, directors, and employees, including defendants Kriens, Sindhu, Berry, and Gani, received backdated in-the-money options and thus took excess and unjustified compensation at the expense of Juniper and its public stockholders;

   d.   the Company's financial statements for at least the years 1999-2005 and 1Q 2006 violated GAAP and, as a result, E&Y's unqualified opinions on Juniper's financial results for these years were materially false and misleading;

   e.   the procedures for and control of the making, accounting for, and reporting of stock options grants were insufficient to prevent manipulation; and

   f.   the systematic, multi-year misconduct potentially subjected Juniper to substantial regulatory fines, penalties, and other legal action, thereby compromising the Company's overall financial condition and prospects.

## THE TRUTH IS GRADUALLY REVEALED

       175.    The March 18, 2006 (weekend) edition of *The Wall Street Journal* contained an

exposé entitled "The Perfect Payday" (the "March 18 WSJ Article") implicating the CEOs at several

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    public companies in the potential backdating of stock option grants beginning in the mid-1990s.

2    That article described a striking pattern where option grants at the companies were consistently

3    dated just before a rise in the stock price, often at a bottom of a steep drop. The article concluded

4    that there was effectively a zero probability of the reported grant dates occurring at random.

5    176.    According to the March 18 WSJ Article, the opportunity to backdate options without

6    detection was facilitated by lax reporting requirements under SEC rules. Until 2002, companies had

7    been permitted to report option grants up to 45 days after the company's fiscal year end. The

8    extended reporting period made it easier to engage in backdating because of the fairly long time

9    period within which to identify and disclose (albeit falsely) a purported date with a low stock price

10    as the option grant date.

11    177.    The SEC reporting requirements were tightened with the passage of SOX. Section

12    16(a) of the Exchange Act and SEC Rule 16a-3 promulgated thereunder now require executives to

13    disclose stock option grants within two business days following the grant. The effect of this

14    reporting change was to reduce, but by no means eliminate, the ability to engage in backdating.

15    Indeed, Juniper has admitted that its option grants were backdated during 2003.

16    178.    It was also reported in the March 18 WSJ Article that companies that had issued

17    backdated options may have violated their stock option plans; may be subject to liability under the

18    federal securities laws for misrepresenting compensation arrangements and inflating reported

19    earnings in violation of GAAP; and could also face potential tax liabilities to the IRS.

20    179.    It was further stated in the March 18 WSJ Article that the SEC was currently

21    examining about a dozen companies' option grants, and suggested that the problem could be far

22    more widespread based on the *Wall Street Journal's* analysis of grant dates and stock movements.

23    The Article did not identify Juniper as a current or potential target of the government investigation,

24    and the price of Juniper stock did not react on the next trading day, Monday, March 20, 2006, to

25    publication of the Article.

26    180.    Following publication of the March 18 WSJ Article, financial analysts began

27    investigating and identifying potential candidates for option backdating. One of those analyses was

28    performed by the CFRA. CFRA was in the business of performing forensic accounting risk research

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1   and legal and regulatory risk assessment for institutional clients of the firm. It released to its clients

2   a study, dated May 16, 2006, of the top 100 North American companies ranked by stock-based

3   compensation as a percentage of revenues. CFRA identified Juniper as one of 17 companies

4   showing a "high-risk profile" for option-backdating. CFRA considered a company's option

5   backdating risk to be significant when a company had, on three or more occasions, granted options

6   at exercise prices and dates that either matched or were close to a 40-day low in the company's stock

7   price, and the stock price rebounded at least 10% from the low during this period.

8       181.    CFRA identified suspicious grants for Juniper in October 1999, December 2000 and

9   February 2002 (options were "exchanged" by the Officer Defendants in 2001) based on an analysis

10  of Juniper's grants during the period 1997-2002.

11      182.    On May 18, 2006, J. P. Morgan analyst Ehud A. Gelblum, Ph.D. issued a report also

12  identifying Juniper as a likely candidate for backdating. The J. P. Morgan report stated that based

13  on its review of price and grant data for the named executives (including Kriens, Sindhu, and Gani)

14  in Juniper's proxy statements from 1999 through 2005, it found that 6 option grants out of 15 were

15  issued on the dates when Juniper's stock price hit monthly lows. The grant dates identified by J. P.

16  Morgan were the same ones independently selected by CFRA, plus additional grant dates in July

17  2002, April 2003, and September 2003.

18      183.    Also on May 18, 2006, *The Wall Street Journal* published an article entitled

19  "Affiliated Computer Gets Subpoena" (the "May 18 WSJ Article"). That *Wall Street Journal* article

20  reported that federal prosecutors in New York were conducting criminal probes of options-granting

21  practices at UnitedHealth Group, Inc. and Comverse Technology, Inc. It also reported that

22  Affiliated Computer Services, Inc. ("ACS") had received a grand jury subpoena issued by the

23  United States District Court for the Southern District of New York following an announcement that

24  ACS would take a $32 million charge relating to improper accounting for backdated stock options.

25      184.    The May 18 WSJ Article further reported that the SEC investigation had expanded to

26  about 20 companies, and highlighted CFRA's report identifying Juniper as one of 17 companies

27  having "the highest risk of having backdated options." The May 18 WSJ Article stated:

28

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

> Wall Street's interest in identifying potential options problems at companies is also on the rise. An accounting-research firm this week identified 17 companies it termed as having "the highest risk of having backdated options." The research firm, the Center for Financial Research and Analysis, based its analysis on regulatory records and trading patterns.

> Marc Siegel, director of research at CFRA, said the firm's clients, which include investment managers, have been seeking to identify companies with risky option patterns. CFRA looked at 100 companies that issued a high proportion of options relative to their total executive compensation. It then identified those that, on three or more occasions, granted options at exercise prices that matched, or were close to, lows of the company stock price between 1997 and 2002, followed by a bounce of at least 10% in share price.

> Among the 17 were Juniper Networks Inc., a Sunnyvale, Calif., networking-equipment company . . . <u>Half of the grants to Juniper were considered at risk by CFRA.</u>

(Emphasis added.)

185.    Following the widespread coverage of the CFRA and J. P. Morgan reports identifying Juniper as a high-risk candidate for options backdating, the price of Juniper stock declined 11% from a closing price of $16.87 per share on May 17, 2006 to close at $15.06 per share on May 19, 2006, on extraordinarily heavy trading volume. Between May 2 and 15, 2006, the 10 trading days preceding May 16, 2006, the date of the CFRA study, Juniper's average daily trading volume was approximately 9.0 million shares. On May 16, 2006, the reported volume was 15.1 million shares, with the volume rising to 16.1 million, 18.1 million and 33.8 million over the next three days of trading as the adverse news entered the marketplace.

186.    Market professionals attributed the decline in the price of Juniper shares to the disclosures concerning the potential backdating of stock options at the Company. For example, on May 19, 2006, *TheStreet.com* issued an article headlined "Options Talk Hits Juniper, F5," linking the decline in the price of Juniper shares to the reports concerning the risk of option backdating at Juniper. That May 19 article stated in relevant part:

> Concerns over stock-option timing broadened this week to include tech shops Juniper (JNPR:Nasdaq) and F5 Networks (FFIV:Nasdaq).

> Analysts sorting through public filings found that option grants at Juniper and F5 were repeatedly priced over seven years at the stocks' monthly lows. To market watchers, these patterns suggest that the options could have been timed or backdated to maximize their value to

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                                    Page 48

company executives.

Wall Street, already jittery over inflation news, has shown little sympathy for companies that have come under scrutiny in a growing options-backdating scandal.

Shares of Juniper fell 4% Thursday and F5 has slid 12% in the past three days on worries that these stock-option grants will invite investigations and costly legal battles.

\*    \*    \*

Juniper and F5 were pulled into the options-timing spotlight this week after analysts flagged patterns of questionable grant dates. Accounting muckrakers at Center for Financial Research and Analysis identified 17 companies that may have to explain some troublesome option datings.

And JPMorgan analyst Ehud Gelblum released a report Thursday reviewing executive-option grants for 14 companies dating back to 1998. Three of the companies – Motorola (MOT: NYSE), Juniper and F5 – show a suspicious pattern of grants at their stock's low for a given month.

\*    \*    \*

Six out of 15 grants to executives at Internet gearmaker Juniper occurred on exactly the lowest day for the stock in each given month, says Gelblum, who declined to offer an opinion on the transactions.

A Juniper representative said it was too early to comment. "We need to go back to figure out why those grants were given on a particular day, and we are in the process of doing that," the rep said.

Observers say ideally, options granting dates should be arbitrary and have no consistent relationship to the highs and lows of the stock price. Or better yet, grants could be dated at the same time each year to avoid any impression of favorable timing.

Executives and compensation committees that arrange for the option to have the best date effectively add millions of dollars of value of the stock should the price go up. It's an unfair advantage, say investors.

"If these dudes were timing, that is simply wrong and immoral," says one New York money manager. "If their board of directors let them – then that is simply ridiculous and a major breach of fiduciary duty."

187.    The May 19, 2006 edition of the *Los Angeles Times* also gave wide coverage to the CFRA report. The article, entitled "Report Suggests Companies Backdated Stock Option Grants," quoted Marc A. Siegel, CFRA research director, as follows: "We're trying to identify companies that may have a high-risk profile [of backdating] and warrant further attention." Mr. Siegel further

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 | explained in the article:

> Until 2002, the Securities and Exchange Commission allowed companies to report option grants several weeks after the date of the actual grant. The loophole tempted companies to select the most beneficial date to maximize the value of the grants . . . So if a company's stock price hit a 40-day low near the time of the public filing, the company could pick that date as the issue date. The low price then became the base price, giving executives even more money than they would otherwise have received when they sold it at a higher price later. In the study, the center matched grant dates to within weeks of those periodic lows in the companies' stock prices . . . Those grant dates were deemed "at risk." The 17 high-risk companies [including Juniper] had at least three such grant dates over the five-year period.

188. On May 22, 2006, Juniper issued a press release announcing that the Company had received a request for information from the office of the United States Attorney for the Eastern District of New York relating to the Company's granting of stock options. Juniper represented that it was actively engaged in responding to this request for information and intended to cooperate fully with all matters concerning the request, and that its Audit Committee, with the assistance of independent counsel and advisors, was also reviewing the Company's historical stock option granting practices. On the release of this news, Juniper shares dropped to a 52-week low of $14.62 per share on May 22, 2006.

189. Juniper responded that same day with positive news, (a) announcing that it had maintained its number two market share position in both the Service Provider and High-End Enterprise Ratings markets, according to a report issued by Synergy Research Group, and (b) reporting at a J.P. Morgan Securities global technology conference that revenues for the third quarter of 2006 were expected to match second-quarter levels, and were expected "to accelerate in the fourth quarter."

190. However, securities analysts covering Juniper also raised concerns over the adverse implications of Juniper's becoming embroiled in the options backdating investigation. On May 22, 2006, Bear Stearns stated that "[n]ew concerns over options backdating may impact the stock further." That same day, Morgan Keegan & Co., Inc. elaborated on its concerns as follows:

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**JNPR: Business Sound, Options Concerns Create A Cloud**

- Juniper's stock down 7% last week, reflects concerns from options expensing. Juniper was cited in a recent report along with others as companies that may have exploited a past loophole in SEC regulations regarding pricing options prior to Sarbanes-Oxley in 2002.

- The situation presents risks to the stock. The stock could remain under pressure from a witch hunt mentality. Negative scenarios include potential SEC investigations, restatements, filing delays, and tarnished management credibility.

191. After the close of business on May 22, 2006, the Associated Press reported that Standard & Poor's rating services had "placed its ratings on Juniper Networks on Credit Watch with negative implications, citing the probe related to the company's stock option grants."

192. On May 23, 2006, Bank of America cut its target price for Juniper from $19 to $15, based in part on the potential negative implications of the government's stock options investigation. As reported on Bloomberg:

> Bank of America cuts their tgt to $15 from $19 following cautious commentary by the co's CFO, news that the US Attorney General has requested info regarding the co's executive option grants, and general concerns on the co's competitive position.

193. On May 24, 2006, Prudential Equity Group, LLC and Credit Suisse also reduced their respective price targets for Juniper stock. Prudential analyst Inder Singh concluded that "[w]e expect this to remain as an overhang on the stock until the investigations are finished." Similarly, Credit Suisse analyst Paul Silverstein advised investors:

> This reduced guidance also comes against the backdrop, and potential overhang, of an inquiry commenced by the Attorney General for the Eastern District of New York looking into JNPR's options grants over a 10-year period, which appears to be related to the growing "backdating" issue highlighted in the Wall Street Journal over the course of the past week.

194. Juniper's stock price dropped to $15.03 on May 23, 2006, from a May 22 closing price of $15.49, and fell again on May 24 to close at $14.55. This capped a 13.8 percent net price decline (or $2.32 per share) in Juniper stock from $16.87 on May 17 to close at $14.55 on May 24,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  2006.

2  195.   The price of Juniper shares rose from May 25 through June 1, 2006, when it was

3  announced by Standard & Poor's ("S&P") that Juniper shares would be added to the S&P 500

4  Index. As a result of the disclosures concerning this unrelated event, Juniper shares rose on

5  exceptionally heavy volume from a low of $14.54 per share on May 25, to a closing price of $17.47

6  per share on June 1, as index funds tracking the S&P 500 Index added Juniper shares to their

7  holdings.

8  196.   On July 19, 2006, the Company issued a press release announcing net revenues for

9  the second quarter of 2006 of $567.5 million, compared with $493.0 million for the same quarter of

10  2005, an increase of 15 percent. In conjunction with these positive financial results, the Company

11  also made a short, non-committal disclosure about the Audit Committee investigation. The release

12  stated that the Audit Committee had reached a preliminary conclusion that the actual measurement

13  dates for financial accounting purposes of certain stock option grants issued in the past differed from

14  the recorded grant dates of such awards. However, the release continued, the Board had not yet

15  determined the scope or amount of any charges it might record, nor had it determined the potential

16  tax and accounting impact, including whether a restatement was required. Juniper also stated that it

17  would defer filing a report on SEC Form 10-Q for the quarter ended June 30, 2006 until after

18  completion of the investigation, which the Company anticipated would occur after the filing

19  deadline under SEC rules.

20  197.   On August 9, 2006, Juniper's Board of Directors, upon the recommendation of the

21  Audit Committee, concluded that the Company's financial statements and all earnings press releases

22  and similar communications relating to the period beginning January 1, 2003 should no longer be

23  relied upon, including the Company's financial statements for 2003, 2004, and 2005 and the interim

24  periods contained therein, and 1Q 2006.

25  198.   On August 10, 2006, the Company issued a press release entitled "Juniper Networks

26  Announces Update Regarding Stock Option Investigation" stating in relevant part:

27          Although the investigation is ongoing, upon the recommendation of
               management and the Audit Committee, the Juniper Board of Directors
28          has concluded that the Company will need to restate historical

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

2

financial statements to record additional non-cash charges for stock-based compensation expense related to past option grants. The Company has not determined the amount of such charges, the resulting tax and accounting impact, or which specific periods require restatement. Accordingly, the Company today filed a Form 8-K with the SEC stating that the financial statements and all earnings press releases and similar communications issued by the Company relating to periods beginning on or after January 1, 2003 should therefore not be relied upon.

3

4

5

6

(Emphasis added.)

7

199.    On August 10, 2006, the close of the Class Period, Juniper shares declined to a

8

closing price of $12.90 per share from a close of $13.41 per share on August 9, and the price

9

continued to fall to a closing price of $12.20 per share on August 11, 2006. This $1.21 per share

10

drop represented a two-day decline of nine percent and was based on extraordinarily heavy volume.

11

In this regard, between August 1 and August 8, 2006, Juniper's average daily trading volume was

12

approximately 6.6 million shares. The volume of trading rose to 10.2 million, 14.3 million and 34.7

13

million shares on August 9 through 11, respectively.

14

200.    Market professionals attributed the foregoing decline in the price of Juniper shares to

15

the latest adverse disclosures concerning the backdating of stock options at the Company. For

16

example, a August 11, 2006 article entitled "Friday's Tech Winners & Losers" on *TheStreet.com*

17

reported the following:

18

**Juniper Networks** (JNPR) slumped 6% after the company said it would have to restate three years of earnings reports after it found backdated stock-option grants.

19

20

The Sunnyvale, Calif., networking company said it was notified in May that regulators were looking into the company's option practices. One analyst's report found six of 15 option grants to executives were dated at the stock's low for the month.

21

22

23

The company said in a press release Thursday that an internal review showed date discrepancies.

24

Juniper's audit committee has "reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock-option grants issued in the past differ from the recorded grant dates of such awards," according to the press release.

25

26

27

"The company will need to restate historical financial statements to record additional non-cash charges for stock-based compensation expense related to past option grants," the company said.

28

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

2        Juniper was recently trading at $12.13 after shedding 77 cents.

3    (Emphasis in original.)

4        201.    On November 20, 2006, Juniper announced that the NASDAQ Stock Market had sent

5    Juniper a notice of noncompliance with NASDAQ rules for failing to timely file its 3Q 2006 Form

6    10-Q due to the Audit Committee's ongoing investigation into the Company's historical stock

7    option practices. Juniper also reported that it had had a hearing before the NASDAQ Listing

8    Qualifications Panel on September 26, 2006, and was awaiting a decision concerning its NASDAQ

9    listing.

10       202.    On December 20, 2006, the Company announced that as a result of the Audit

11   Committee's seven-month review, Juniper had determined to record non-cash charges of

12   approximately $900 million resulting from the improper accounting for backdated option granted

13   between June 9, 1999 and December 31, 2003. The December 20 release broadly outlined the

14   irregularities found by the review:

15              •       There were numerous instances where option grants were
                        backdated, so as to give favorable exercise prices.
16
                •       The Audit Committee identified serious concerns regarding the
17                      actions of certain former management in connection with the
                        stock option granting process.
18
                •       Formal documentation of stock option grants often lagged the
19                      reported grant dates.

20              •       Management failed to exercise sufficient responsibility for the
                        stock option granting process.
21
                •       CEO Kriens received two option grants prior to 2001 in which
22                      the reported grant dates were prior to the actual date his
                        options were approved.
23

24       203.    CEO Kriens also admitted that the Company had failed to establish adequate controls

25   over the stock option granting process: "In prior years, we should have had better stock option

26   granting processes, controls and oversight in place, and we did not."

27       204.    On or about March 9, 2007, Juniper filed with the SEC the 2006 Form 10-K and the

28   quarterly Reports on Form 10-Q for June 30, 2006 and September 30, 2006. These filings included

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 the restatement of "selected consolidated financial data for the years 2002 through 2005, plus

2 restated unaudited quarterly financial information for the interim periods of 2005 and the first

3 quarter ended March 31, 2006."

4    205.    Juniper admitted in its 2006 Form 10-K that from 1999 through 2004, the Company

5 had improperly accounted for an astounding 110.5 million in stock options, or 76% of the 146

6 million in stock options issued during the period.

7    206.    As a result, Juniper was required to record approximately $900 million in additional

8 compensation charges and associated tax costs which negatively impacted earnings over its seven-

9 year life as a public company from June 1999 through March 31, 2006. A table reflecting the

10 impact on Juniper's pre-tax and net income from recognizing these compensation expenses is

11 annexed as Exhibit A.

12    207.    Juniper provided a summary of the Audit Committee's investigation in Item 6 of the

13 2006 Form 10-K. The Audit Committee's full report, which covers an analysis of all Juniper option

14 grants from June 24, 1999 to May 23, 2006, has not been publicly released.

15    208.    The Audit Committee's findings of improper accounting and other evidence of

16 management's wrongdoing were summarized in the 2006 Form 10-K as follows:

17
18
19
20
21
22
23
24
25
26
27
28
> The Company has concluded that the measurement dates of a large
> number of grants to non-Officers during the period between June 1999
> and December 2004 were incorrect. The Company's practice has been
> to grant stock options, except where prohibited, to nearly all full-time
> employees in connection with joining the Company. To facilitate the
> granting of options to Juniper Networks' rapidly growing workforce,
> the Board of Directors established a Stock Option Committee to grant
> options to non-Officer employees. Between June 1999 and June 2003,
> the dates for a large number of grants made by the Stock Option
> Committee were chosen with the benefit of hindsight as to the price of
> the Company's stock, so as to give favorable exercise prices.
> Moreover, the Stock Option Committee's process for finalizing and
> documenting these grants was often completed after the originally
> assigned grant date. Beginning with grants dated June 20, 2003, the
> Company implemented a number of new procedures and policies
> regarding the granting of options to non-Officer employees. After
> that, the pattern of consciously looking back for the most favorable
> dates for the employees ceased. However, the documentation and
> written approvals of grant dates still generally trailed the recorded
> grant dates. Based on all available facts and circumstances, the
> originally recorded measurement dates for the grants made by the
> Stock Option Committee during the period from July 1999 through
> December 2004 can not be relied upon in isolation.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

(Emphasis added.)

209.    The Audit Committee also found similar improprieties concerning options granted to Juniper executives:

> The Company has concluded that the measurement dates of several grants to executive officers who were "reporting persons" as that term is defined under Section 16 of the Securities Exchange Act of 1934, as amended ("Officers") and members of the Board of Directors made between June 1999 and June 2003 were incorrect... . <u>There were several instances in which grants to Officers or directors were given grant dates (and corresponding exercise prices) prior to the date on which formal corporate action making the grant was taken.  In general, this appears to have been done to make the grant date coincide with either a specific event, such as the appointment or re-election of a director or with the purported date options were granted to non-Officers</u>.  In these cases, the Company has determined that the correct measurement date is the date on which the Board or Compensation Committee took the action to approve the grant.

(Emphasis added.)

210.    The Audit Committee also described numerous other accounting improprieties relating to the granting of options, including (a) grants made by persons or committees who did not have the authority to make the grants in question; (b) grant dates given for new employees backdated to the date that the new employee began working for Juniper; and (c) grants made without any documentation evidencing approval by the Board of Directors or Compensation Committee.

211.    Juniper has also admitted that the Company had identified "material weaknesses in our internal control over financial reporting related to our stock option granting practices and the related accounting in periods ending prior to June 30, 2006." Juniper admitted that prior to 2003 "we did not have sufficient safeguards in place to monitor our control practices regarding stock option pricing and related financial reporting." The Company stated that over the next four years (June 2003 through 2006), Juniper implemented numerous improvements, including:

> •    In response to the requirements of SOX, documenting accounting policies, processes and procedures; and assessing the design and operation effectiveness of internal controls over financial reporting.  These efforts led to segregating responsibilities, adding reviews and reconciliations, and redefining roles and responsibilities.
>
> •    Implementing the practice of using the receipt of the final Board of

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Directors, Compensation Committee or Stock Option Committee approval as the grant and measurement date for stock option grants.

• Also in response to certain of the reporting requirements of SOX, which requires executive officers to report stock option grants within two business days, implementing new procedures for stock option grants that were designed to provide reasonable assurance that stock options were priced on the actual grant date.

• Effective January 1, 2006, adopting SFAS No. 123R and added controls in stock administration, human resources and finance functions to ensure that stock-based compensation expenses are recorded correctly.

• Obtaining additional resources with responsibilities for financial reporting, internal controls, compliance and stock accounting and administration.

• Upgrading systems and system controls that support the stock option granting processes.

212.    Prior to the filing of the 2006 Form 10-K, Defendants had not reported any problems with the Company's internal disclosure controls or the nature and extent of its accounting improprieties. On the contrary, the Juniper Defendants repeatedly misrepresented that the internal controls were adequate, that the Company's financial statements were prepared in accordance with GAAP, and that Juniper was not required to record compensation expenses for option grants because they were priced as of the dates the grants had been approved.

213.    In conjunction with the Company's release of the Audit Committee's findings and the restatement of financial results in the 2006 Form 10-K, Marshall and defendant Levy, two of the three members of the Compensation Committee, resigned from the Board of Directors.

214.    Both Levy and Marshall are affiliated with other technology companies that were linked to improper accounting for stock options and that have restated or intend to restate their historic financial results.

215.    Levy is the founder and former CEO of KLA, and served as its Chairman of the Board until his resignation on October 16, 2006. During Levy's tenure as CEO, Berry served as KLA's general counsel and reported to Levy. KLA has admitted backdating stock option grants during this period and has taken an accounting charge exceeding $375 million to redress the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1    misconduct. On July 25, 2007, KLA announced that it had reached a settlement with the SEC by

2    consenting to the entry of a permanent injunction against future violations of the reporting, books

3    and records, and internal control provisions of the federal securities laws.

4       216.    Levy has also been a Director of Extreme Network Inc. ("Extreme Network") since

5    2001, and has served on Extreme Network's Audit Committee, Compensation Committee and

6    Nominating and Corporate Governance Committee. Extreme Network has admitted that there were

7    deficiencies in its processes for approving and documenting stock option grants made during 1999

8    through 2004. As a result, Extreme Network restated its financial reports for 2002 through 2005 and

9    recorded a $223 million compensation expense to correct the improprieties.

10      217.    Marshall was a Juniper director and a member of the Compensation Committee from

11    2004 until his resignation on February 20, 2007 amidst the Audit Committee investigation relating

12    to Juniper's stock option grants. Marshall was concurrently a director of PMC-Sierra, Inc.

13    ("PMC"). PMC has admitted that it intends to restate its financial statements as a result of improper

14    accounting for stock options, and record compensation charges up to $100 million.

15      218.    Robert Dykes, who had served as Juniper's CFO from January 2005, also resigned

16    immediately following Juniper's release of its 2006 10-K and 10-Q reports for the second and third

17    quarters of 2006. During his tenure, Juniper (a) continued to improperly account for stock options

18    issued through year-end 2004, thereby inflating its reported financial results; (b) misrepresented the

19    Company's compensation practices under its Stock Option Plans; and (c) misrepresented that the

20    Juniper's internal controls regarding financial reporting were adequate.

21      219.    Dykes signed Juniper's Form 10-K Reports for 2004 through 2006 and the

22    Company's Form 10-Q reports for the interim quarters for 2005 and 2006. Dykes also signed

23    certifications pursuant to SOX in connection with each of these reports, attesting to the accuracy of

24    the Company's financial statements and related disclosures, and the effectiveness of its internal

25    disclosure controls and procedures.

## THE SEC ACTIONS

27      220.    After obtaining significant documentary evidence and testimony during its 15-month

28    investigation, on August 28, 2007 the SEC filed a civil action in this Court against Juniper premised

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1   on the stock option backdating at the Company.  That lawsuit sought, *inter alia*, a permanent

2   injunction against violations of the antifraud, reporting,  books-and-records, proxy and internal

3   control provisions of the Exchange Act and the pertinent SEC rules and regulations promulgated

4   thereunder.  *SEC v. Juniper Networks, Inc.*, C 07-4430 JW (N.D. Cal.) (the "SEC Juniper Action").

5   The SEC Juniper Action was settled by Juniper's entry into a permanent injunction against any

6   future violations of the applicable provisions of the Exchange Act, including the pertinent SEC rules

7   and regulations.

8       221.    Also on August 28, 2007, the SEC filed a civil action in this Court against Berry for

9   her alleged misconduct in connection with the stock option backdating at Juniper and KLA.  That

10  lawsuit seeks, inter alia, to enjoin Berry from violating the antifraud, reporting, books-and-records,

11  proxy and internal control provisions of the Exchange Act and the applicable SEC rules and

12  regulations promulgated thereunder.  *SEC v. Lisa C. Berry*, C 07-4431 RMW (N.D. Cal.) (the "SEC

13  Berry Action").  The SEC Juniper Action and the SEC Berry Action are collectively referenced

14  herein as the "SEC Actions."

15                                  **ADDITIONAL SCIENTER ALLEGATIONS**

16      222.    Numerous facts raise a strong inference that Berry knew or recklessly disregarded

17  that (a) the Company issued options grants which were backdated in violation of the Company's

18  Stock Option Plans and contrary to its public representations, and (b) the stock options were

19  improperly accounted for in the Company's financial statements contained in Juniper's SEC filings

20  and other public disclosures.

21  **Berry and the Other Officer Defendants Participated In and Profited From the Backdating**

22      223.    As described above at ¶¶ 24 and 81, Berry (and the other Officer Defendants)

23  comprised the Stock Option Committee that issued more than 100 million backdated options – they

24  selected dates with the benefit of hindsight to give themselves and other Juniper employees

25  favorably priced in-the-money options, and then doctored the documentation to make it appear that

26  the options were issued at fair market value on the grant date, rather than in-the-money.

27      224.    For each backdated grant from 1999 through 2003, Berry routinely created fictitious

28  minutes for Stock Option Committee meetings that never occurred.  These minutes falsely stated

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  that the Stock Option Committee had met and granted stock options on a date, selected with

2  hindsight, when the stock had a lower closing price than the price on the actual grant date.

3      225.   Berry signed the fictitious minutes approving each of the backdated grants as a

4  member of the Stock Option Committee. Similarly, co-members Kriens and Gani either signed the

5  minutes or approved the facsimile stamps of their signatures to be used to sign them.

6      226.   The minutes reported Stock Option Committee meetings at which at least 60 separate

7  grants were purportedly made, when in fact the Stock Option Committee rarely held meetings

8  during 1999 through 2003, whether in person, telephonically, or otherwise. For example, the Stock

9  Option Committee minutes stated that stock option grants were issued to the Officer Defendants on

10  December 21, 2000. In fact, no Stock Option Committee meeting occurred on that date; Berry had

11  left the country early that same morning, and the options were not granted until early January 2001.

12      227.   From 1999 through 2003, Kriens, Gani, and Sindhu personally profited by receiving

13  at least 6,910,000 backdated stock options granted by Berry, Kriens, and Gani as members of the

14  Stock Option Committee. Based upon its extensive investigation of Juniper's records, the SEC also

15  identified at least five separate occasions when Berry also received backdated options in undisclosed

16  amounts – May 11, 2000; December 21, 2000; April 11, 2001; July 1, 2002; and March 12, 2003 –

17  mostly the same dates that the other Officer Defendants received backdated options.

18      228.   For each of their grants, Kriens, Gani, and Sindhu filed Form 4s with the SEC which

19  falsely listed the backdated grant date rather than the actual date they were approved. Berry

20  prepared the Form 4s and was given power of attorney to sign on their behalf. Similarly, Berry

21  drafted the Proxy Statements for 2000 through 2003 which falsely listed the backdated grant dates

22  rather than the actual dates the options were approved, thereby disguising the fact that Juniper

23  executives were issued in-the-money options in violation of the Stock Options Plan.

24      229.   Because Berry and the other SOC members routinely issued in-the-money options to

25  themselves and other Juniper executives, Berry knew or recklessly disregarded that the

26  representations in the Proxy Statement that stock options were issued at fair value, *i.e.*, at the market

27  price on the date of grant, were false.

28      230.   Berry (and the other Officer Defendants) was highly motivated to deceive investors,

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 because they reaped millions of dollars in instant gains from the backdating of their stock option

2 grants, by far the largest component of their compensation without reporting compensation expenses

3 that would have reduced Juniper's earnings and subjected the grantees to additional income tax.

4 Based upon the backdating scenarios described in ¶¶ 91-100 and 111-23, *supra*, in-the-money option

5 grants increased or could have increased the value of the options received by Kriens, Gani and

6 Sindhu alone by $65.8 million (depending on the actual grant date), as summarized in the table

7 below.

8 **Immediate Gain In Intrinsic Value ($)**

| Year | Kriens | Sindhu | Gani |
|------|------------|------------|------------|
| 1999 | 27,280,000 | 16,372,800 | 7,276,800 |
| 2000 | 3,448,000* | 860,000* | 862,000* |
| 2002 | 1,936,000 | 1,056,000 | 1,760,000 |
| 2003 | 2,496,000 | 936,000 | 1,560,000 |
| | 35,160,000 | 19,224,800 | 11,458,800 |

Total Gains = 65,843,600

\* Based on lowest potential gain in value

231. Moreover, Gani and Berry profited from exercising backdated options and

simultaneously selling the shares. Gani cashed in his backdated options for at least a $3,800,000

windfall during the Class Period, as follows:

**Gani's Profits from Backdated Stock Options**

| Date of Exercise and Stock Sale | Shares | Exercise Price | Stock Sale Price | Profit ($) |
|------|------|------|------|------|
| 7/15/03 | 50,000 | 5.69 | 14.6980 | 450,400.00 |
| 5/24/04 | 50,000 | 5.69 | 20.5123 | 741,115.00 |
| 8/4/04 | 50,000 | 5.69 | 22.2900 | 830,000.00 |
| 10/20/04 | 50,000 | 5.69 | 24.1597 | 923,485.00 |
| 10/21/04 | 50,000 | 5.69 | 24.1730 | 462,075.00 |
| 10/22/04* | 50,000 | 5.69 | 24.1873 | 462,432.50 |
| Total | 300,000 | | | 3,869,507.50 |

\* Options were exercised on 10/22/04 and sold on 10/23/04.

232. Berry also exercised Juniper stock options and sold the shares, profiting from the

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1   wrongdoing as well. As noted previously, the number of backdated stock options Berry received
2   and exercised, and the amount of proceeds she received, is not yet know to Plaintiff and not yet a
3   matter of public record.

4       233.    Juniper's Audit Committee conducted an independent investigation in which it
5   identified serious concerns regarding the actions of certain former management in connection with
6   the stock option granting process. This reference to former management at a minimum implicates
7   former SOC member Berry (and Gani).

8       234.    As general counsel and a member of the Stock Option Committee, Berry
9   substantially participated in the preparation of the disclosures concerning compensation and stock
10  options in the Company's SEC filings, and reviewed and discussed the disclosures. Each Form 10-
11  K and 10-Q represented that under APB No. 25, no compensation was recorded in connection with
12  the option grants, because the exercise price of all options granted under these plans was equal to the
13  market price of the underlying stock on the grant date; yet the Stock Option Committee, using the
14  benefit of hindsight, issued millions of in-the-money options with an exercise price *below* the
15  market price on the grant date.

16      235.    There is a strong inference that a Company executive who actively engaged in the
17  selection of exercise dates for option grants was well aware of the transaction's consequences to the
18  Company and the recipients. This inference is supported by the fact that APB No. 25 is simple in its
19  application – as explained in Juniper's financial reports, companies that backdate option grants with
20  hindsight will incur compensation expenses.

21      236.    Given the enormous amount of stock options issued as compensation to Juniper's
22  entire workforce, Berry was keenly aware of the potentially devastating impact on Juniper's
23  financial condition that would result if the Company failed to comply with APB No. 25 and was
24  required to record compensation expenses in connection with its options grants. During 1999-2003,
25  the acknowledged period of backdating, Juniper reported $46 million in net income. Had the
26  Company been required to record compensation expenses, the reported earnings would have been
27  wiped out many times over, as evidenced by the hundreds of millions of dollars of expenses
28  recorded in the Company's restated financial results. Moreover, Juniper would have reported an

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  accumulated deficit from the time it went public until the fourth quarter of 2005.

2      237.  Accordingly, Juniper's earnings and business model depended upon the Company

3  qualifying for favorable tax treatment under APB No. 25. The potential loss of favorable accounting

4  treatment under APB No. 25 was so significant that it was included as a risk factor in the

5  Company's SEC filings that could "materially and adversely affect our business." For example, the

6  Juniper Defendants represented the following on page _____ of the Juniper 2004 Form 10-K:

7          Recent rulemaking by the Financial Accounting Standards Board will

8          require us to expense equity compensation given to our employees and
        will significantly harm our operating results and may reduce our

9          ability to effectively utilize equity compensation to attract and retain
        employees.

10                          *    *    *

11          By causing us to incur significantly increased compensation costs,

12          such accounting changes will reduce our reported earnings and will
        require us to reduce the availability and amount of equity incentives

13          provided to employees, which may make it more difficult for us to
        attract, retain and motivate key personnel. Each of these results could

14          materially and adversely affect our business.

15      238.  Berry and the other SOC members disguised the fact that Juniper issued in-the-

16  money options in order to provide undisclosed instant gains to the recipients without subjecting

17  them to additional income tax, and to avoid subjecting Juniper to millions of dollars in

18  compensation costs.

19      239.  After conducting a lengthy investigation of Juniper's stock option practices, the SEC

20  has charged Berry with securities fraud. In connection with its investigation, Berry asserted her

21  Fifth Amendment privilege against self-incrimination.

22  **Duration, Magnitude and Pervasiveness of the Wrongdoing**

23      240.  The duration, magnitude, and pervasiveness of the scheme support a strong inference

24  of fraudulent conduct by Berry. Juniper admits that option grants deviated from the Company's

25  reported practices for more than five years, from June 1999 through 2004, and covered options

26  grants exceeding 110 million shares, representing 76% of the Company's options granted during this

27  period. Moreover, the Company acknowledged that most of the options were deliberately backdated

28  from at least July 1999 through June 2003.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

241.    The Company also admitted in its 2006 Form 10-K that Juniper's financial statements issued during the Company's life as a public company (from June 1999 until August 10, 2006) could no longer be relied upon, and restated five years of financial statements. Juniper also took a massive $900 million charge for compensation expenses associated with backdated stock options that reduced earnings for seven years.

## Insider Trading

242.    Each of the Officer Defendants and defendant Sindhu also sold substantial amounts of their shareholdings before and during the Class Period, while the backdating of options was concealed and Juniper's earnings were inflated. In total, Kriens, Gani, and Sindhu reaped a total of approximately $217,000,000 in proceeds from Class Period sales, as indicated in the tables below:

### Scott Kriens – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
| --- | --- | --- | --- |
| 10/17/2001 | 150,000 | 23.0730 | 3,460,950.00 |
| 10/17/2001 | 200,000 | 23.7038 | 4,740,760.00 |
| 10/18/2001 | 150,000 | 22.0900 | 3,313,500.00 |
| 7/31/2002 | 9,200 | 8.3100 | 76,452.00 |
| 8/19/2002 | 490,000 | 8.3819 | 4,113,856.15 |
| 11/22/2002 | 500,000 | 8.6673 | 4,333,650.00 |
| 2/19/2003 | 500,000 | 9.0382 | 4,519,100.00 |
| 5/7/2003 | 500,000 | 12.0515 | 6,025,750.00 |
| 7/15/2003 | 500,000 | 14.8264 | 7,413,200.00 |
| 10/15/2003 | 155,000 | 15.3406 | 2,377,793.00 |
| 10/15/2003 | 150,000 | 17.2707 | 2,590,605.00 |
| 10/16/2003 | 95,000 | 17.2014 | 1,634,133.00 |
| 10/16/2003 | 100,000 | 17.1439 | 1,714,390.00 |
| 1/21/2004 | 500,000 | 29.7469 | 14,873,450.00 |
| 5/26/2004 | 200,000 | 21.3543 | 4,270,860.00 |
| 5/26/2004 | 300,000 | 21.3510 | 6,405,300.00 |
| 7/16/2004 | 200,000 | 23.9998 | 4,799,960.00 |
| 7/16/2004 | 300,000 | 24.0704 | 7,221,120.00 |
| 10/24/2004 | 200,000 | 24.0111 | 4,802,220.00 |
| 10/24/2004 | 300,000 | 24.0111 | 7,203,330.00 |
| 5/4/2005 | 200,000 | 23.1811 | 4,636,220.00 |
| 5/4/2005 | 50,000 | 23.2221 | 1,161,105.00 |
| 5/4/2005 | 250,000 | 22.7159 | 5,678,975.00 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

## Scott Kriens – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|------|--------------------|-----------------|--------------|
| 7/29/2005 | 400,000 | 24.0576 | 9,623,040.00 |
| 8/1/2005 | 100,000 | 24.0524 | 2,405,240.00 |
| 10/26/2005 | 500,000 | 23.1536 | 11,576,800.00 |
| Total | 6,999,200 | | 130,971,759.15 |

## Pradeep Sindhu – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|------|--------------------|-----------------|--------------|
| 10/19/2001 | 50,000 | 21.5900 | |
| 10/24/2001 | 40,000 | 25.2375 | 1,009,500.00 |
| 10/26/2001 | 40,000 | 25.5100 | 1,020,400.00 |
| 4/15/2003 | 200,000 | 9.8869 | 1,977,380.00 |
| 5/7/2003 | 100,000 | 12.1948 | 1,219,480.00 |
| 5/12/2003 | 100,000 | 12.5110 | 1,251,098.00 |
| 7/24/2003 | 100,000 | 14.3921 | 1,439,209.00 |
| 8/19/2003 | 100,000 | 14.5949 | 1,459,490.00 |
| 8/20/2003 | 50,000 | 15.3941 | 769,705.00 |
| 8/22/2003 | 50,000 | 15.5240 | 776,200.00 |
| 10/21/2003 | 50,000 | 17.1662 | 858,310.00 |
| 10/28/2003 | 50,000 | 17.3010 | 865,050.00 |
| 10/29/2003 | 25,000 | 17.7000 | 442,500.00 |
| 10/30/2003 | 50,000 | 18.0370 | 901,850.00 |
| 1/21/2004 | 100,000 | 29.6574 | 2,965,740.00 |
| 1/27/2004 | 100,000 | 29.3286 | 2,932,860.00 |
| 5/13/2004 | 50,000 | 22.5192 | 1,125,960.00 |
| 8/3/2004 | 108,895 | 22.7514 | 2,477,513.70 |
| 8/5/2004 | 100 | 22.7500 | 2,275.00 |
| 8/6/2004 | 100,000 | 21.5809 | 2,158,090.00 |
| 8/10/2004 | 91,005 | 21.4712 | 1,953,986.56 |
| 2/2/2005 | 50,000 | 24.6668 | 1,233,340.00 |
| 2/2/2005 | 50,000 | 24.6655 | 1,233,275.00 |
| 2/9/2005 | 50,000 | 23.4997 | 1,174,985.00 |
| 2/9/2005 | 50,000 | 23.4995 | 1,174,975.00 |
| 4/27/2005 | 50,000 | 22.9711 | 1,148,555.00 |
| 4/27/2005 | 50,000 | 22.9692 | 1,148,460.00 |
| 5/4/2005 | 200,000 | 23.0300 | 4,606,000.00 |
| 5/4/2005 | 100,000 | 23.0962 | 2,309,620.00 |
| 5/11/2005 | 50,000 | 23.4926 | 1,174,630.00 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

## Pradeep Sindhu – Stock Sales

2

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|------|--------------------|-----------------|--------------|
| 5/11/2005 | 50,000 | 23.3206 | 1,166,030.00 |
| 5/11/2005 | 50,000 | 23.3197 | 1,165,985.00 |
| 5/13/2005 | 50,000 | 24.2655 | 1,213,275.00 |
| 7/27/2005 | 50,000 | 23.4759 | 1,173,795.00 |
| 7/27/2005 | 50,000 | 23.4765 | 1,173,825.00 |
| 8/3/2005 | 50,000 | 24.3315 | 1,216,575.00 |
| 8/3/2005 | 50,000 | 24.3309 | 1,216,545.00 |
| 8/10/2005 | 100,000 | 34.5687 | 3,456,870.00 |
| 10/26/2005 | 50,000 | 23.0317 | 1,151,585.00 |
| 10/26/2005 | 50,000 | 23.0348 | 1,151,740.00 |
| 11/2/2005 | 250,000 | 23.6172 | 5,904,300.00 |
| 11/2/2005 | 50,000 | 23.8683 | 1,193,415.00 |
| 11/2/2005 | 50,000 | 23.8740 | 1,193,700.00 |
| 11/9/2005 | 50,000 | 24.4183 | 1,220,915.00 |
| 11/9/2005 | 50,000 | 24.4198 | 1,220,990.00 |
| 1/25/2006 | 50,000 | 21.2985 | 1,064,925.00 |
| 1/25/2006 | 50,000 | 21.2941 | 1,064,705.00 |
| 2/1/2006 | 50,000 | 18.1984 | 909,920.00 |
| 2/8/2006 | 50,000 | 19.0063 | 950,315.00 |
| 2/8/2006 | 50,000 | 18.9939 | 949,695.00 |
| Total | 3,455,000 | | 73,649,042.26 |

## Marcel Gani – Stock Sales

| Date | No. of Shares Sold | Price Per Share | Proceeds ($) |
|------|--------------------|-----------------|--------------|
| 11/25/2002 | 100,000 | 9.5629 | 956,290.00 |
| 5/7/2003 | 50,000 | 12.3448 | 617,240.00 |
| 7/15/2003 | 50,000 | 14.6980 | 734,900.00 |
| 10/14/2003 | 50,000 | 17.6697 | 883,485.00 |
| 11/4/2003 | 50,000 | 18.5850 | 929,250.00 |
| 1/21/2004 | 50,000 | 29.5378 | 1,476,890.00 |
| 5/24/2004 | 50,000 | 20.5123 | 1,025,615.00 |
| 5/24/2004 | 50,000 | 20.5123 | 1,025,615.00 |
| 8/4/2004 | 50,000 | 22.2900 | 1,114,500.00 |
| 8/4/2004 | 50,000 | 22.2900 | 1,114,500.00 |
| 10/20/2004 | 50,000 | 24.1597 | 1,207,985.00 |
| 10/21/2004 | 25,000 | 24.1730 | 604,325.00 |
| 10/23/2004 | 25,000 | 24.1873 | 604,682.50 |
| Total | 650,000 | | 12,295,277.50 |

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1

2       243.    As noted previously, during the Class period Berry also sold Juniper shares,

3   including shares acquired from the exercise of backdated options, in amounts and at prices not yet

4   known to Plaintiff.

5       244.    Berry and the other Officer Defendants sold their stock while in possession of

6   material adverse non-public information concerning Juniper, namely, the Company's improper

7   accounting for in-the-money stock option grants that inflated Juniper's earnings. Accordingly, the

8   Officer Defendants' massive insider trading and underreporting of compensation to the IRS supports

9   a strong inference of scienter.

10

11                        **INAPPLICABILITY OF SAFE HARBOR**

12      245.    Defendants' false and misleading statements and omissions do not constitute

13  forward-looking statements protected by any statutory safe harbor. The statements alleged to be

14  false and misleading herein all relate to facts and conditions existing at the time the statements were

15  made. No statutory safe harbor applies to any of the defendants' material false or misleading

16  statements.

17      246.    Moreover, the statutory safe harbor is inapplicable with respect to the false and

18  misleading statements included in Juniper's financial statements, which purported to be prepared in

19  accordance with GAAP.

20                **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
                  **THE FRAUD-ON-THE-MARKET DOCTRINE**
21

22      247.    The market for Juniper's stock and Notes was open, well developed, and efficient at

23  all relevant times, for the following reasons (among others):

24      a.  the Company's shares met the requirements for listing, and were listed and actively
            traded, on the NASDAQ National Market System;
25

26      b.  as a regulated issuer, Juniper filed periodic public reports with the SEC;

27      c.  Juniper regularly communicated with public investors via established market
            communication mechanisms, including through regular disseminations of press
            releases on the Company's website, Juniper.com, on the national circuits of major
28          newswire services, and through other wide-ranging public disclosures, such as

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS                    Page 67

1    communications with the financial press and other similar reporting services;

2    d.    the market reacted immediately to the wide public dissemination of information by
3          and concerning Juniper;

4    e.    Juniper was followed by numerous securities analysts employed by major brokerage
          firms who wrote reports which were distributed to the sales force and certain
5          customers of their respective brokerage firms.  Each of these reports was publicly
          available and entered the public marketplace;

6    f.    the material misrepresentations and omissions alleged herein would tend to induce a
7          reasonable investor to misjudge the value of Juniper securities; and

8    g.    without knowledge of the misrepresented or omitted material facts, Plaintiff and the
          other members of the Class purchased or otherwise acquired Juniper securities
          between the time defendants made the material misrepresentations and omissions and
9          the time the fraudulent backdating was being disclosed, during which time the price
          of Juniper securities was inflated by defendants' misrepresentations and omissions.
10

11    248.    As a result of the foregoing, the market for Juniper's securities promptly digested

12    current information regarding Juniper from all publicly available sources and reflected such

13    information in Juniper's securities prices.  Under these circumstances, all purchasers and acquirers

14    of Juniper's securities during the Class Period suffered similar injury through their purchase or

15    acquisition of Juniper's securities at artificially inflated prices, and a presumption of reliance

16    applies.

17                                    **LOSS CAUSATION**

18    249.    As detailed herein, during the Class Period, Berry (and the other Officer Defendants)

19    engaged in a scheme to deceive the market and a course of conduct that artificially inflated Juniper's

20    securities prices and operated as a fraud or deceit on purchasers of Juniper securities by

21    misrepresenting the Company's financial results, stock options and compensation practices, and

22    internal controls.  When the prior misrepresentations and fraudulent conduct began to be disclosed

23    and became apparent to the market, Juniper securities declined in value as the prior artificial

24    inflation came out of Juniper's securities prices.  As a result of their purchases or acquisition of

25    Juniper securities during the Class Period, Plaintiff and other members of the Class suffered

26    economic loss, *i.e.*, damages, under the federal securities laws.

27    250.    The false and misleading representations concerning Juniper's financial results and

28    management compensation, and the Company's violation of Company and SEC policies and

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  accounting regulations regarding compensation expenses, caused and maintained the artificial

2  inflation in Juniper's securities prices throughout the Class Period and until the truth was slowly

3  revealed to the market.

4      251.    Starting in May 2006 through the end of the Class Period on August 10, 2006,

5  investors began to learn the truth upon a number of disclosures, including Juniper's admissions,

6  revealing, among other things, that: (a) Juniper had engaged in substantial backdating of stock

7  option grants issued to, among others, officers, directors, and employees from June 1999 through

8  2003; (b) Juniper's published financial statements during and prior to the Class Period were

9  materially misleading for failing to record compensation expenses associated with these stock option

10  grants, and the Company's reported earnings were inflated; (c) senior management and directors had

11  neither conducted themselves with integrity nor in the best interest of the Company's shareholders;

12  and (d) the Officer Defendants sold shares of Juniper based on material non-public information.

13  These revelations did not happen all at once, but rather were the result of investigation by financial

14  analysts such as CFRA and J.P. Morgan, as well as other academics, journalists and investors, who

15  pieced together facts concerning the ever-widening abusive stock options issuance practices at other

16  companies and applied that analysis to Juniper to discover the fraud. As investors and the market

17  became aware of the true facts, which had been misrepresented in Juniper's public filings, the prior

18  artificial inflation came out of Juniper's securities prices, damaging investors.

19      252.    As a result of these disclosures and the public revelations regarding Juniper's

20  issuance of stock options, and the falsity about Juniper's previous Class Period representations,

21  Juniper's stock price dropped from $16.87 per share on May 17, 2006 to as low as $12.20 per share

22  on August 11, 2006 on extraordinarily heavy trading volume. This drop removed the inflation from

23  Juniper's securities prices, causing economic loss to investors who had purchased the securities

24  during the Class Period.

25      253.    In sum, the economic loss, *i.e.*, damages, suffered by Plaintiff and other members of

26  the Class was a direct result of the fraudulent scheme to artificially inflate Juniper's securities prices

27  and the subsequent significant decline in the value of Juniper's securities when the truth was

28  revealed.

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  254.    In contrast, the post-Class Period rebound of Juniper's stock was attributable to new

2  market conditions, macroeconomic or industry factors and Company-specific facts unrelated to the

3  fraudulent conduct alleged herein.

### CLAIMS FOR RELIEF
### COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

255.    Plaintiff repeats and realleges each and every allegation contained above, as if fully
set forth herein.

256.    Plaintiff asserts this Count against Berry under Section 10(b) of the Exchange Act, 15
U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

257.    During the Class Period, Berry carried out a plan, scheme, and course of conduct
which was intended to and, throughout the Class Period, did: (a) increase the value of Juniper stock
options by backdating the reported grant dates and disguising this fact from investors; (b) deceive
the investing public, including Plaintiff and other Class members, as alleged herein; (c) artificially
inflate and maintain the market price of Juniper's securities; and (d) cause Plaintiff and other
members of the Class to purchase or otherwise acquire Juniper's securities at artificially inflated
prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Berry took the actions
set forth herein.

258.    Berry (a) employed devices, schemes, and artifices to defraud; (b) made untrue
statements of material fact and/or omitted to state material facts necessary to make the statements
not misleading by use of means or instrumentalities of interstate commerce; and (c) engaged in acts,
practices, and a course of business which operated as a fraud and deceit upon the purchasers and
acquirers of the Company's securities, which artificially inflated the market prices for Juniper's
securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

259.    As a result of her making and/or their substantial participation in making affirmative
statements and reports to the investing public, Berry had a duty to promptly disseminate truthful
information that would be material to investors in compliance with the integrated disclosure

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. § 229.10 *et seq.*) and other

2  SEC regulations, including accurate and truthful information with respect to the Company's

3  compensation expenses and stock option practices so that the market prices of the Company's

4  publicly traded securities would be based on truthful, complete, and accurate information. Berry's

5  material misrepresentations and omissions as set forth herein violated that duty.

6      260.     Berry also had a duty to correct any statements that were reasonable when made but

7  became misleading because of subsequent events. She breached that duty by failing to correct the

8  false and misleading representations concerning Juniper's reported financial results and stock option

9  grants and practices that are detailed herein.

10     261.     Berry engaged in the fraudulent activity described above knowingly or in such a

11  reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. She

12  knowingly or recklessly caused her reports and statements to contain misstatements and omissions

13  of material fact as alleged herein.

14     262.     As a result of Berry's fraudulent activity during her tenure at Juniper, the market

15  price of Juniper securities was artificially inflated during the Class Period.

16     263.     In ignorance of the true financial condition of Juniper, Plaintiff and other members of

17  the Class, relying on the integrity of the market and/or on the statements and reports of Juniper

18  containing the misleading information, purchased or otherwise acquired Juniper securities at

19  artificially inflated prices during the Class Period.

20     264.     The market price of Juniper's securities declined materially upon the public

21  disclosure of the true facts which had been misrepresented or concealed as alleged herein.

22     265.     Plaintiff's and the Class' losses were proximately caused by Berry's active and

23  primary participation in Juniper's scheme to defraud the investing public by, *inter alia*, falsifying

24  the Company's financial results through the knowing or reckless failure to properly apply GAAP,

25  and concealing adverse information regarding Juniper's stock option grant practices and the

26  accounting for these compensation costs. Plaintiff and the members of the Class purchased Juniper

27  securities in reliance on the integrity of the market price of those securities. Plaintiff's and the

28  Class' losses were a direct and foreseeable consequence of Berry's failure to disclose and her

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1  concealment of, *inter alia*, the true state of Juniper's business operations and financial condition.

2      266.    As a direct and proximate cause of Berry's wrongful conduct, Plaintiff and other

3  members of the Class suffered damages in connection with their respective purchases and sales of

4  Juniper securities.

5      267.    This action was brought within two years after the discovery of Berry's participation

6  in the fraud and less than five years after the violations attributable to Berry.

7  **COUNT II**

8  **Violation of Section 20(a) of the Exchange Act**

9      268.    Plaintiff repeats and realleges each and every allegation contained above, as if fully

10  set forth herein.

11      269.    Plaintiff asserts this Count against Berry for violations of Section 20(a) of the

12  Exchange Act, 15 U.S.C. § 78t(a).

13      270.    Berry, through her position of control and authority as General Counsel, Vice

14  President and Secretary, and a member of the SOC, was able to and did control, directly and

15  indirectly, the content of the public statements disseminated by the Company, participated in the

16  operation and management of the Company, and conducted and participated, directly and indirectly,

17  in the conduct of Juniper's business affairs relating to the issuance, accounting, and disclosure of

18  stock options.

19      271.    Berry had a duty to disseminate accurate and truthful information with respect to

20  Juniper's financial condition and results of operations.

21      272.    Berry had direct involvement in the day-to-day operations of the Company and was a

22  corporate officer with direct involvement in the Company's reporting and accounting with respect to

23  stock options, and therefore is presumed to have had the power to control or influence the particular

24  transactions and disclosures giving rise to the securities violations alleged herein, and exercised

25  same.

26      273.    Juniper has admitted, *inter alia*, that its financial statements for 1999 through 2005

27  were materially false and misleading, and should not be relied upon; that more than 110 million

28  stock option grants were either backdated or otherwise mispriced; that the options practices violated

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1 the Company's Stock Option Plans and procedures, and the pertinent accounting rules and

2 regulations; and that the Company in many instances lacks the documentation necessary to compute

3 the actual dates and prices of the grants. These admissions and the other facts alleged herein

4 establish Juniper's primary violation of Section 10(b) of the Exchange Act and Rule 10b-5

5 promulgated thereunder.

6 274. By reason of her management position and substantial participation in the disclosures

7 contained in Juniper's SEC filings and releases, Berry was a "controlling person" within the

8 meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the

9 management and the activities of the Company and its employees, and to cause the Company to

10 engage in the unlawful conduct complained of herein. Because of her position within Juniper, Berry

11 had access to adverse non-public financial information about the Company and acted to manipulate

12 and conceal it, or knowingly or recklessly authorized and approved its concealment.

13 275. By virtue of her position as a controlling person of Juniper, Berry is liable pursuant to

14 Section 20(a) of the Exchange Act.

15 276. As a direct and proximate result of Berry's wrongful conduct, Plaintiff and the other

16 members of the Class suffered damages in connection with their purchase or acquisition of Juniper

17 securities during the Class Period.

18 277. This action was brought within two years after the discovery of Berry's participation

19 in the fraud and less than five years after the violations attributable to Berry.

20 ## PRAYER FOR RELIEF

21 WHEREFORE, Plaintiff prays for relief and judgment, as follows:

22 A. Entering an order certifying this lawsuit as a class action under Rule 23, Fed. R. Civ.

23 P.;

24 B. Awarding compensatory damages in favor of Plaintiff and the other Class members

25 against defendant for all damages sustained as a result of defendants' wrongdoing, in an amount to

26 be proven at trial, including interest thereon;

27 C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

28 action, including counsel fees and expert fees; and

1    D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: January 14, 2008

SCHUBERT & REED LLP

WILLEM F. JONCKHEER S.B.N. 178748
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: 415-788-4220
*Local Counsel*

RICHARD W. COHEN
    (Admitted Pro Hac Vice)
DAVID C. HARRISON
    (Admitted Pro Hac Vice)
One North Broadway
White Plains, NY 10601-2310
Telephone: 914-997-0500
*Counsel for Plaintiff The New*
    *York City Pension Funds*

SCHUBERT & REED LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220